**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

DAVID CRESPO, ANTHONY PODIAS,
PEDRO ESPADA, JR., ROLFI ESPINAL,
KESNEL JUSTE and ANTHONY JOSEPH on
their own behalf, and on behalf of two classes
of similarly situated prisoners,

|  |  |
|---|---|
| Plaintiffs, | **AMENDED CLASS ACTION COMPLAINT** |
|  | **Jury Trial Demanded** |
| v. | **17-CV-06329 (RRM)(PK) (E.D.N.Y.)** |

HUGH HURWTIZ, Acting Director, Federal
Bureau of Prisons; MICHAEL CARVAJAL,
Northeast Regional  Director, Federal Bureau
of Prisons; HERMAN QUAY III, Warden,
MDC Brooklyn; KIMBERLY ASK-
CARLSON, former Warden, MDC Brooklyn;
GERARD TRAVERS, Health Services
Administrator, MDC Brooklyn; WAYNE
DECKER, former Food Service Administrator,
MDC Brooklyn; MARY LOU COMER, Food
Service Administrator, MDC Brooklyn.

Defendants.

Plaintiffs, by and through their *pro bono* attorneys, allege, on personal knowledge as to all matters relating to Plaintiffs and on information and belief as to all other matters, against the Defendants as follows:

## NATURE OF THE ACTION

1.   Under the Eighth Amendment to the Constitution of the United States, all citizens are guaranteed that they will not be subjected to "cruel and unusual punishments."  For prisoners incarcerated by the federal government, the Eighth Amendment commands that their ***basic human needs*** will be provided for by the government officials entrusted with authority over them.  For the minimum-security *post-sentenced* male prisoners ("Cadre") held by the Bureau of Prisons ("BOP") at Metropolitan Detention Center Brooklyn ("MDC Brooklyn"), this constitutional guarantee has been continuously and systematically broken and disregarded as a result of being permanently confined in what is effectively a high-security prison.

2.   The Cadre's fundamental constitutional rights have been and are being violated because they should never have been housed at MDC Brooklyn.  Over 90% of MDC Brooklyn's approximately 1700 inmates are high-security *pre-sentenced* inmates who are intended to only be held at MDC Brooklyn temporarily.  Defendant Warden Quay III made clear that MDC Brooklyn is not meant for long-term confinement when he publicly stated that "[t]he individuals that are there [i.e. MDC Brooklyn] are simply there for short stays." John Alexander, *Warden at Brooklyn's Metropolitan Detention Center speaks to Bay Ridge Colonial Club*, BROOKLYN DAILY EAGLE (May 23, 2017, 11:53 AM),

1

http://www.brooklyneagle.com/articles/2017/5/23/warden-brooklyn%E2%80%99s-metropolitan-detention-center-speaks-bay-ridge-colonial-club.

3.      As described in detail below, the medical care provided to Cadre is inconsistent, insufficient and arbitrarily denied by corrections officers unqualified to assess, diagnose or treat medical complaints and conditions. The Cadre's food is frequently spoiled, moldy and contaminated by vermin. Many Cadre were also are deprived of any, let alone adequate, sunlight and fresh air, with some going for ***more than two and a half years*** without once seeing sunlight and or breathing fresh air. Within their housing units, prisoners are continuously exposed to voluminous airborne particulate, including feces and urine.  The "smoking gun" proof that Cadre were and are being confined improperly at MDC Brooklyn was provided by Defendant Warden Quay. Specifically, on August 28, 2017, at approximately 12:20 pm, Defendant Warden Quay stated to several Cadre that he "was directed by Washington Central" to treat Cadre as pre-trial prisoners because Cadre were "in a high-security prison facility."

4.      This lawsuit seeks to halt this inhumane treatment of current and future Cadre.  In addition, this lawsuit seeks to remedy, through the recovery of actual, nominal and punitive damages, the unconstitutional conditions past, present and future Cadre have suffered and will suffer as a direct result of the Defendants' intentional actions and inactions.

5.      The mistreatment of Cadre is similar to the mistreatment of female minimum-security inmates at MDC Brooklyn.  These egregious violations of basic human rights of these inmates were well documented by Federal Defenders, the National Association of

Women Judges and multiple media outlets, including the New York Times.  Only as a result of outside public pressure and scrutiny was the BOP forced to acknowledge the inhumane treatment of female minimum-security inmates at MDC Brooklyn and move all of them to Federal Correctional Institute Danbury, a facility appropriate for the permanent confinement of minimum-security prisoners.  Similarly, this lawsuit seeks to improve conditions for Cadre.

## JURISDICTION AND VENUE

6.   Named Plaintiffs and the classes bring claims pursuant to the Eighth Amendment of the United States Constitution.

7.   This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1361 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

8.   Metropolitan Detention Center Brooklyn is a Federal Bureau of Prisons facility located at 80 29th Street, Brooklyn, NY 11232.  MDC Brooklyn is located in the Eastern District of New York Judicial District and lies within the Northeast Region of the BOP.

9.   Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claims brought by Plaintiffs and the classes have occurred in this District.

## PARTIES

**A.    Named Plaintiffs**

3

10.    Plaintiff DAVID CRESPO (20969-014) is a 62-year-old male, minimum-security prisoner who has been held at MDC Brooklyn since February 13, 2015.  His anticipated release date is February 17, 2019.

11.    Plaintiff PEDRO ESPADA (78764-053) is a 63-year-old male, former minimum-security prisoner who was held at MDC Brooklyn between approximately November 20, 2014 and April 3, 2017.

12.    Plaintiff ANTHONY PODIAS (71145-054) is a 42-year-old male, former minimum-security prisoner. He was a prisoner at MDC Brooklyn during the period April 4, 2016 to February 3, 2017.

13.    Plaintiff KESNEL JUSTE (66663-019) is a 42-year-old male, former minimum-security prisoner. He was held at MDC Brooklyn between August 11, 2015 and April 25, 2017.

14.    **Plaintiff ANTHONY JOSEPH** (83438-053) is a 53-year-old male, former minimum-security prisoner who was held at MDC Brooklyn between June 20, 2016 and December 15, 2016.

15.    Plaintiff ROLFI ESPINAL (97951-038) is a 50-year-old male, former minimum-security prisoner who was held at MDC Brooklyn between August 30, 2016 and September 26, 2017.

**B.    Defendants**

16.    Defendant HUGH J. HURWITZ is the Acting Director of the Federal Bureau of Prisons. He has held this position since May 18, 2018.  Defendant Acting Director Hurwitz holds this position through appointment by the Attorney General under 18 U.S.C. § 4041.  As

4

BOP Director, Defendant Acting Director Hurwitz is required to ensure that the BOP "provide[s] suitable quarters and provide for the safekeeping, care and subsistence of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2). BOP policies, which govern inmate living conditions, medical care and food, are promulgated under the authority and approval of the Director. *See, e.g.*, Electronic Cigarettes, 1640.06 (Nov. 9, 2017), https://www.bop.gov/policy/progstat/1640_006.pdf. As such, Defendant Acting Director Hurwitz has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail at MDC Brooklyn, as described below in paragraphs 31-103 below. He has, therefore, directly and proximately caused, and will continue to cause in the future, the injuries and violations of rights set forth below. Defendant HURWITZ is sued in his official capacity only.

17. Defendant MICHAEL CARVAJAL is the Director of the Northeast Region of the Federal Bureau of Prisons. He has held this position since July 10, 2016. He is also the designated recipient of all "Regional Administrative Remedy Appeal" forms, also known as a "BP-10," from MDC Brooklyn. The Regional Director provides supervision at the BOP Regional level concerning inmate food (Food Service Manual, P4700.06 (Sept. 13, 2011), https://www.bop.gov/policy/progstat/4700_006.pdf); institution facilities (Facilities Operations Manual, 4200.12 (July 18, 2017), https://www.bop.gov/policy/progstat/4200.12.pdf); and inmate health care (Health Services Administration, 6010.05 (June 26, 2014), https://www.bop.gov/policy/progstat/6010_005.pdf). Additionally, per BOP policy, promulgated by the BOP Director, the Regional Director is informed by Wardens of any

5

death in their institution and reviews the Warden's report. Escapes/Death Notices, 5553.08 (January 4, 2017), https://www.bop.gov/policy/progstat/5553.08.pdf.  As such, Defendant Carvajal has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail at MDC Brooklyn, as described in paragraphs 31-103 below.  He has, therefore, directly and proximately caused, and will continue to cause in the future, the injuries and violations of rights set forth below.  Defendant CARVAJAL is sued in both his personal and official capacities.

18.   Defendant HERMAN QUAY III is the Warden of MDC Brooklyn. He has held this position since December 2015. He is also the designated recipient of all "Request for Administrative Remedy" forms, also known as a "BP-9," from MDC Brooklyn.  Pursuant to BOP policy, promulgated by the BOP Director, the Warden has supervisory authority over their facility, including inmate medical care and procedures (Health Services Administration, 6010.05 (June 26, 2014), https://www.bop.gov/policy/progstat/6010_005.pdf); Health Care Provider Credential Verification, Privileges, and Practice Agreement Program, 6027.02 (Oct. 12, 2016), https://www.bop.gov/policy/progstat/6027_002.pdf); institutional facilities (Facilities Operations Manual, 4200.12 (July 18, 2017), https://www.bop.gov/policy/progstat/4200.12.pdf); and the authority to issue local instructions that implement BOP policy (Directives Management Manual, 1221.66 (Sept. 15, 1997), https://www.bop.gov/policy/progstat/1221_066.pdf).  Additionally, per BOP policy, promulgated by the BOP Director, the Warden is required to investigate the death of any inmate in their institution and report to the Regional Director. Escapes/Death

Notices, 5553.08 (January 4, 2017), https://www.bop.gov/policy/progstat/5553.08.pdf.
As such, Defendant Quay has caused, created, authorized, condoned, ratified, approved
or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions,
actions, policies, customs and practices that prevail at MDC Brooklyn, as described in
paragraphs 31-103 below.  He has, therefore, directly and proximately caused, and will
continue to cause in the future, the injuries and violations of rights set forth below.
Defendant QUAY is sued in both his personal and official capacities.

19.   Defendant KIMBERLY ASK-CARLSON was the Warden of MDC Brooklyn from
February 2014 through December 2015.  She was also the designated recipient of all
"Request for Administrative Remedy" forms, also known as a "BP-9," from MDC
Brooklyn during her tenure as Warden of MDC Brooklyn.  Pursuant to BOP policy,
promulgated by the BOP Director, the Warden has supervisory authority over their
facility, including inmate medical care and procedures (Health Services Administration,
6010.05 (June 26, 2014), https://www.bop.gov/policy/progstat/6010_005.pdf; Health
Care Provider Credential Verification, Privileges, and Practice Agreement Program,
6027.02 (Oct. 12, 2016), https://www.bop.gov/policy/progstat/6027_002.pd); institutional
facilities (Facilities Operations Manual, 4200.12 (July 18, 2017),
https://www.bop.gov/policy/progstat/4200.12.pdf); and the authority to issue local
instructions that implement BOP policy (Directives Management Manual, 1221.66 (Sept.
15, 1997), https://www.bop.gov/policy/progstat/1221_066.pdf).  Additionally, per BOP
policy, promulgated by the BOP Director, the Warden is required to investigate the death
of any inmate in their institution and report to the Regional Director. Escapes/Death
Notices, 5553.08 (January 4, 2017), https://www.bop.gov/policy/progstat/5553.08.pdf.

As such, Defendant Ask-Carlson has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail at MDC Brooklyn, as described in paragraphs 31-103 below.  She has, therefore, directly and proximately caused the injuries and violations of rights set forth below.  Defendant ASK-CARLSON is sued in her personal capacity only.

20.     Defendant GERARD TRAVERS is the Health Systems Administrator of MDC Brooklyn. He has held this position since July 2015.  Pursuant to BOP policy, promulgated by the BOP Director, the Health Services Administrator "plans, implements, and directs all aspects of the department's administration." Health Services Administration, 6010.05, 7 (June 26, 2014), https://www.bop.gov/policy/progstat/6010_005.pdf.  The Health Services Administrator is required to annually review all institutional Health Services Unit policies and procedures and, if necessary, revise them "subject to local negotiations." *Id.* at 6.  The Health Services Administrator "report[s] to the Warden." *Id.* at 5.  As such, Defendant Travers has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail at MDC Brooklyn, as described in paragraphs 35-41 and 67-69 below.  He has, therefore, directly and proximately caused, and will continue to cause in the future, the injuries and violations of rights set forth below.  Defendant TRAVERS is sued in both his personal and official capacities.

21.     Defendant WAYNE DECKER was the Food Service Administrator of MDC Brooklyn. He held this position since before October 2015 and until approximately September 2017.

Pursuant to 28 C.F.R. § 547.20, the "Bureau of Prisons is responsible for procuring and preparing any food or food ingredients to be served to the institution's inmate population." According to BOP policy, promulgated by the BOP Director, the Food Service Administrator "has oversight and direction of Food Service functions in the institution; ensures compliance with Bureau policies relating to Food Service; and performs duties in the Standardized Position Description for Food Service Administrator." Food Service Manual, P4700.06, 10 (Sept. 13, 2011), https://www.bop.gov/policy/progstat/4700_006.pdf. As such, Defendant Decker has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail at MDC Brooklyn, as described below. He has, therefore, directly and proximately caused, the injuries and violations of rights set forth in paragraphs 57-60 below. Defendant DECKER is sued in his personal capacity only.

22. Defendant MARY LOU COMER is the Food Service Administrator of MDC Brooklyn. She has held this position since approximately September 2017. Pursuant to 28 C.F.R. § 547.20, the "Bureau of Prisons is responsible for procuring and preparing any food or food ingredients to be served to the institution's inmate population." According to BOP policy, promulgated by the BOP Director, the Food Service Administrator "has oversight and direction of Food Service functions in the institution; ensures compliance with Bureau policies relating to Food Service; and performs duties in the Standardized Position Description for Food Service Administrator." Food Service Manual, P4700.06, 10 (Sept. 13, 2011), https://www.bop.gov/policy/progstat/4700_006.pdf. As such, Defendant Comer has caused, created, authorized, condoned, ratified, approved or

9

knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail at MDC Brooklyn, as described below.  She has, therefore, directly and proximately caused, and will continue to cause in the future, the injuries and violations of rights set forth in paragraphs 57-60 below. Defendant COMER is sued in her official capacity only.

## **CLASS ACTION ALLEGATIONS**

23.  Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on behalf of two classes defined as:

> a) For the purpose of injunctive relief, any male minimum-security sentenced inmates incarcerated at MDC Brooklyn currently or in the future ("Injunctive Relief Class").

> b) For the purpose of the recovery of actual and punitive damages, any male minimum-security sentenced inmates who were incarcerated at any point between October 31, 2014 and October 31, 2017 (the "Class Period") at MDC Brooklyn ("Damages Class").

24.  There are currently approximately 140 Cadre incarcerated at MDC Brooklyn and potentially thousands of Cadre held at MDC Brooklyn over the past three years.  The classes are thus so numerous that joinder of all members is highly impracticable, if not impossible, pursuant to Fed. R. Civ. P. 23(a)(1).

25.  All members of the classes are, or have been, incarcerated in MDC Brooklyn under substantially similar deplorable and unconstitutionally deficient living conditions caused

by the Defendants.  As a result, the questions of fact and law presented in this case are common to all members of the classes pursuant to Fed. R. Civ. P. 23(a)(2).

26.     Pursuant to Fed. R. Civ. P. 23(a)(3), the six named Plaintiffs' claims are typical of the claims of the classes.  Plaintiff Crespo has been incarcerated at MDC Brooklyn since February 13, 2015 and is anticipated to remain incarcerated in MDC Brooklyn until February 17, 2019.  Mr. Crespo is therefore typical and representative of the Injunctive Relief Class.  All named Plaintiffs are, or were, incarcerated at MDC Brooklyn during the Damages Class period, with Plaintiffs Espada and Crespo each being incarcerated at MDC Brooklyn for more than two-thirds of the Damages Class period.  All named Plaintiffs have suffered physical harm, of the type and nature alleged here by the classes, at MDC Brooklyn, because of the Defendants' widespread unconstitutional actions and inactions.

27.     The named Plaintiffs are all represented *pro bono* by Weil, Gotshal & Manges LLP, whose attorneys have significant experience in class action litigation and will adequately represent the classes pursuant to Fed. R. Civ. P. 23(a)(4).

28.     Pursuant to Fed. R. Civ. P. 23(b)(2), injunctive relief is appropriate with respect to the Injunctive Relief Class as a whole because the Defendants have systemically failed and continue to fail to provide constitutionally sufficient facilities to the Injunctive Class as a whole.

29.     Additionally, pursuant to Fed. R. Civ. P. 23(b)(3), a class action with respect to the Damages Class is superior to other available methods for a fair and efficient adjudication of this matter in that the prosecution of separate actions by individual class members,

whose claims would be factually and legally similar to those of the class representatives, would unduly burden the judicial system and potentially result in dispositions that would impair the interests of those class members not party to the individual actions.

30.  Class certification is warranted in this action because Defendants have consistently failed, and continue to fail, to provide constitutionally sufficient living conditions for all members of both the proposed Injunctive and Damages Classes.

## FACTUAL ALLEGATIONS COMMON TO THE PLAINTIFF CLASSES

31.  Defendants are, and have been, aware of the factual allegations below during their tenures in their respective positions of official federal authority.  This awareness has stemmed not only from the inherent responsibility and authority of their positions but also from multitudinous informal and formal complaints by members of the Plaintiff classes and other non-Plaintiff class inmates at MDC Brooklyn, media coverage and multiple reports by the National Association of Women Judges (NAWJ) Women in Prison Committee.  *See, e.g*., Judge Robin S. Garson ET AL., *Second Visit to BOP's Metropolitan Detention Center (MDC), Brooklyn, New York, June 3, 2016*, Nat'l Ass'n of Women Judges, Women in Prison Committee, https://www.nawj.org/uploads/files/monthly_update/referenced_docs/july_2016/bop_nawj_june_3_2016_visit_metropolitan_detention_center_ny.pdf (last visited Sept. 11, 2017); Judge Cheryl J. Gonzales, *Visit to BOP's Metropolitan Detention Center (MDC), Brooklyn, New York, March 20, 2015*, Nat'l Ass'n of Women Judges, Women in Prison Committee, newsdocvoices.com/wp-content/uploads/MDCVisitFinal-1.docx (last visited Sept. 11, 2017).

32.    During the Class Period, Defendants Ask-Carlson, Quay, Travers, Decker and Comer
       would participate in a program called "Main Line."  During Main Line, senior MDC
       Brooklyn administrators and officials would meet with Cadre in their housing units and
       field questions and complaints.  Main Line was held, and continues to be held,
       approximately every two weeks.  Throughout the Class Period, Cadre would raise issues
       at Main Line concerning Cadre living conditions, deficient food and inadequate medical
       care, as detailed below in paragraphs 35-103.

33.    The NAWJ reports specifically noted inhumane deficiencies in living conditions, food
       quality, fresh air and sunlight access and medical care. The reports also noted that these
       issues were present since at least December 2013.  Although the report detailed
       conditions for female minimum-security inmates, rather than male, the unconstitutionally
       deficient conditions of the Cadre, detailed below, are and were substantively similar to
       those experienced by female minimum-security inmates. Specifically, both female
       minimum-security prisoners and Cadre at MDC Brooklyn were fed from a common
       source, received medical care from a common source and were both housed in units
       without access to sunlight or fresh air.

34.    In addition to the NAWJ reports, local and national news organizations have reported on
       the inhumane conditions at MDC Brooklyn. *See, e.g.*, Joseph Goldstein, *Pregnant and in
       a Brooklyn Jail That a Judge Called Shameful*, N.Y. Times, March 15, 2017, at A1;
       Joseph Goldstein, *Asked to Reduce Prison Rape, Then Accused of Sexual Abuse*, N.Y.
       Times, May 26, 2017, at A22 (reporting that multiple MDC Brooklyn supervisors
       allegedly raped, threatened and abused inmates at MDC Brooklyn); Morning Edition, *For
       Female Inmates In New York City, Prison Is A Crowded, Windowless Room*, NPR

13

(January 16, 2017), http://www.npr.org/2017/01/16/505315466/for-female-inmates-in-new-york-city-prison-is-a-crowded-windowless-room (reporting on the lack of medical care, spoiled food, lack of access to sunlight and fresh air and generally poor living conditions at MDC Brooklyn).  Several MDC Brooklyn personnel, including two supervisors, were recently charged with civil rights violations and aggravated sexual abuse towards inmates under their custody.   Dep't of Justice, *Three Federal Corrections Officers Charged with Sexually Abusing Female* Inmates, U.S. Attorney's Office, Eastern District of New York (May 25, 2017), https://www.justice.gov/usao-edny/pr/three-federal-correctional-officers-charged-sexually-abusing-female-inmates.  These and other reports make clear that there have been, are, and will continue to be systemic violations of the Eighth Amendment at MDC Brooklyn.  By failing to remedy these conditions, Defendants have demonstrated deliberate indifference to the excessive risks to inmate health or safety posed by the factual allegations below.

**A. Deficient Medical Care**

35.  Not only does the Eighth Amendment guarantee adequate healthcare, but during the Class Period, according to MDC Brooklyn's own guidelines, Cadre were guaranteed multiple healthcare rights, including that "[y]our reports of pain will be believed," "[h]ealth Professionals who respond quickly to reports of pain," and "the right to receive prescribed medications and treatments in a timely manner, consistent with the recommendations of the prescribing health care provider."  Metro. Det. Ctr., Brooklyn, N.Y., *Admission and Orientation Manual for Pre-Trial, and Holdover Inmates*, 9 (rev. ed. 2009), https://www.bop.gov/locations/institutions/bro/BRO_aohandbook.pdf.  As

detailed below, these promised rights were and continue to be consistently ignored and abuse by the Defendants, to an unconstitutional extent.

36.     Corrections officers under the supervision and control of the named Defendants routinely deny Cadre access to necessary medical care.  At times, corrections officers threaten Cadre with punishment due to the corrections officers' entirely unqualified and incorrect opinions that the Cadre are "faking" their illness.

37.     Even when permitted by corrections officers to seek medical care, the care itself is unconstitutionally deficient.  Often, medical care is provided to Cadre by an insufficient number of overburdened staff and contract physicians and physicians' assistants. Requests to obtain medical care are often ignored, sometimes for a period of weeks or months.  Examinations, when performed, are frequently cursory with little follow-up or remedial care.  Referrals to specialists are insufficient or non-existent.  There is an utter lack of rehabilitation within the prison environment, including forcing, under threat of punishment, medically excused Cadre to work.  Worse, the medical facilities at MDC Brooklyn are unsanitary, with vermin droppings and other contaminations visible within the medical wing.

38.     The most egregious instance of this refusal to provide proper medical care occurred with the death of Francisco Gomez (92275-054).  On the evening of January 23, 2017, Mr. Gomez complained to Corrections Officer Lopez of intense head pain and cramping. Corrections Officer Lopez initially refused to call for emergency medical assistance but after continued pleading from Mr. Gomez and other Cadre, eventually relented and called for medical help.  After waiting for over an hour and half, Mr. Gomez was finally seen by

15

MDC medical personnel, who concluded that Mr. Gomez was faking. After being

returned to his bunk, Mr. Gomez was unable to stand. On the morning of January 24,

2017, Mr. Gomez once again sought medical assistance but was initially refused care as

the MDC Brooklyn medical personnel claimed to be "too busy" to see him. At this point,

Mr. Gomez's head pain had increased, his entire right side was cramping and he was

unable to speak.  More than fifteen hours after requesting emergency assistance, Mr.

Gomez was transported to the hospital, where it was determined that he had a blood clot

in his brain.  This blood clot would ultimately cause his death.

39.     In December 2014, the U.S. Office of Special Counsel ordered the reinstatement of Dr.

Michelle Belgard, who had been discharged after whistleblowing on the deficient medical

care provided to prisoners at MDC Brooklyn.  At the time of her dismissal, Dr. Belgard

was one of only *two* primary care physicians for the entirety of MDC Brooklyn's prisoner

population.  Dr. Belgard had raised concerns to her supervisors that inmates at MDC

Brooklyn were not receiving necessary medicines and were going for months or even

over a year without being treated.  Instead of correcting these deficiencies, Dr. Belgard's

superiors discharged her.

40.     According to the June 3, 2016 report on conditions at MDC Brooklyn published by the

National Association of Women Judges, Defendant Warden Quay admitted that medical

services at MDC Brooklyn were inadequate and that the BOP could not find sufficient

doctors to service the needs of prisoners at MDC Brooklyn.  Judge Robin S. Garson ET

AL., *Second Visit to BOP's Metropolitan Detention Center (MDC), Brooklyn, New York,*

*June 3, 2016*, Nat'l Ass'n of Women Judges, Women in Prison Committee,

https://www.nawj.org/uploads/files/monthly_update/referenced_docs/july_2016/bop_naw

j_june_3_2016_visit_metropolitan_detention_center_ny.pdf (last visited Sept. 11, 2017).

41.     This failure by Defendants to provide constitutionally sufficient medical care to the Cadre

has caused, causes and will continue to cause physical harm and related mental and

emotional harms to the Plaintiff classes.

**B. Inhumane Cadre Housing Conditions**

42.     The Eighth Amendment guarantees adequate living conditions, which MDC Brooklyn

further guaranteed in its own manual, specifically noting that Cadre "have the right to a

safe, clean and healthy environment."  Metro. Det. Ctr., Brooklyn, N.Y., *Admission and*

*Orientation Manual for Pre-Trial, and Holdover Inmates*, 9 (rev. ed. 2009),

https://www.bop.gov/locations/institutions/bro/BRO_aohandbook.pdf.  As detailed

below, Defendants have failed to fulfill the guarantees of both the Constitution and their

own guidelines.

43.     From the beginning of the Class Period until August 3, 2017, Cadre were housed in two

adjacent units of similar design.  Both units were entirely cut off from sunlight and fresh

air.  The lights in the Cadre units were never turned completely off. Air was provided

through a filtration/ventilation system that was last thoroughly cleaned in 2014 and

appeared to contain mold.  The vents themselves were visibly clogged and infested with

unknown matter.

44.     Cadre slept in bunkbeds surrounding a common area containing tables where Cadre ate

practically all of their meals.  The mattresses upon the bunkbeds were often stained with

urine and feces.  The toilet and shower area was separated from the eating and living area

by a 4.5-foot wall, which allowed fecal, urine and other particulate matter to circulate throughout the unit.  Mold was also clearly visible on the showers, floors and walls of the shower area.

45.     Two washers and two dryers were located in each Cadre unit and were in almost constant use.  The dryers vented directly into the Cadre units, rather than the outside, releasing substantial particulate matter into the air.

46.     On August 3, 2017, the Cadre were relocated at Defendant Warden Quay's direction to two cellblocks in a different building and floor within MDC Brooklyn.  These Cadre cellblocks are on the same floor as two high-security pre-trial detention cellblocks and share a common corridor.  As a result, Cadre are frequently forced to be in close proximity to those accused of violent or dangerous offenses as the pre-trial detainees and Cadre are moved about the facility.

47.     Unlike in their previous unit, Cadre currently sleep in two tiers of cells, rather than in a common space.  There are generally two Cadre per cell.  Approximately 115 Cadre are housed in cells in one unit and approximately 25 Cadre are housed in the other unit. Mattresses in the cell bunks are still often stained with urine and feces.  Toilets for the unit are located in the cells, approximately five feet from the Cadre's beds, and do not have lids.  Additionally, the toilets are artificially restricted in how often they can be flushed, resulting in feces and urine, and their particulate, remaining in close proximity to Cadre.  That the toilets are in the cells themselves, and unreasonably restricted in flushing, has only concentrated the amount of waste particulate matter to which the Cadre are exposed.

48.  On the nights of August 13 and 17, 2017 and October 9, 2017, water access was completely shut-off for unknown reasons, resulting in the inability to flush the toilets or perform other basic hygienic activities.  Water access is also cut off during lockdowns, which occur multiple times per week in the new Cadre unit and can last up to three hours per occurrence.  While in the previous Cadre unit, lockdowns occurred at a rate of approximately twice per year.

49.  Two washers and two dryers are located in each Cadre unit and are in almost constant use.  The dryers vent directly into the Cadre units, rather than the outside, releasing substantial particulate matter into the air.

50.  The combined particulate matter in the Cadre unit is so voluminous that Cadre must place towels under their cell doors to reduce the amount blown into their individual cells.  The amount of particulate matter collected on these towels on a daily basis is substantial.

51.  In aggregate, the lack of natural sunlight and fresh air and the constant presence of airborne fecal matter, mold, asbestos and other unknown particulate matter in the Cadre housing unit prior to August 3, 2017 have caused physical harm and related mental and emotional harms to the Plaintiff classes during their period of incarceration in the Cadre units of MDC Brooklyn.

52.  In aggregate, the lack of natural sunlight and fresh air and the constant presence of airborne fecal matter and other unknown particulate in the Cadre housing unit after August 3, 2017 have caused, cause and will continue to cause physical harm and related mental and emotional harms to the Plaintiff classes during their period of incarceration in the Cadre units of MDC Brooklyn.

19

## C. Lack of Fresh Air and Sunlight

53.     Compounding the living conditions described above is the fact that from the beginning of

the Class Period until August 3, 2017, there was no outside access whatsoever for the

vast majority of Cadre at MDC Brooklyn and no outside recreation access for **any** Cadre

at MDC Brooklyn.  Of the approximately 140 Cadre at MDC Brooklyn, approximately

25 have "gate passes," which allow the holder to perform labor for the BOP outside the

walls.

54.     On August 3, 2017, the Cadre were relocated to cellblocks previously used to house

inmates in high-security pre-trial detention.  The only benefit to the Cadre of this

relocation is access to outdoor fenced-in basketball courts for limited periods during the

day.  Even this limited access is arbitrarily curtailed, such as during the week of August

14, 2017, when the entire 115 person Cadre unit was prohibited from going outside as a

collective punishment for a contraband sweep.

55.     Even with this recent, limited access to the fenced-in basketball courts, the air quality of

the Cadre housing units is not improved.  Moreover, upon entering MDC Brooklyn, the

vast majority Damages Class members did not see the sun or breathe fresh air until their

release months or years later.

56.     Combined with the lack of sunlight and fresh air within the Cadre housing units, the lack

of any access to sunlight and fresh air whatsoever for the vast majority of Cadre outside

the housing units until August 3, 2017 caused physical harm and related mental and

emotional harms to the Damages Class during their period of incarceration at the Cadre

units of MDC Brooklyn.

**D. Deficient Food Services**

57.     The Eighth Amendment guarantees access to consumable food and MDC Brooklyn's
        own manual promised that Cadre have "the right to be provided healthy and nutritious
        food." Metro. Det. Ctr., Brooklyn, N.Y., *Admission and Orientation Manual for Pre-
        Trial, and Holdover Inmates*, 9 (rev. ed. 2009),
        https://www.bop.gov/locations/institutions/bro/BRO_aohandbook.pdf.  The Defendants
        have consistently failed in their duty to provide food commensurate with the Constitution
        and their own guidelines.

58.     The food preparation areas of MDC Brooklyn are habitually contaminated by the visible
        presence and droppings of rats, mice, cockroaches and flies.  This contamination is then
        passed onto the food itself, which is then consumed by Cadre.

59.     The food itself at MDC Brooklyn is frequently spoiled and moldy, rendering it unfit for
        human consumption.  The food served to Cadre at MDC Brooklyn is prepared elsewhere,
        delivered, reheated, and served an unknown period of time after its initial preparation.
        Repeated complaints by inmates at MDC Brooklyn, including by Cadre, about spoiled
        and contaminated food at MDC Brooklyn have been documented since at least 2008.

60.     This contamination, spoliation, and mold, and the illnesses that inherently stem from such
        conditions, have caused, cause and will continue to cause physical harm and related
        mental and emotional harms to the Plaintiff classes during their period of incarceration in
        the Cadre units of MDC Brooklyn.

## NAMED PLAINTIFF FACTUAL ALLEGATIONS

**A. David Crespo (20969-014)**

61. Mr. Crespo is currently an inmate at MDC Brooklyn. He currently resides in one of the Cadre units described above in paragraphs 46-50 and resided in one of the Cadre units described above in paragraphs 43-45 between February 13, 2015 and August 3, 2017.

62. Mr. Crespo has been classified as a minimum-security prisoner by the BOP.

63. Mr. Crespo has been diagnosed as a diabetic.

64. Mr. Crespo has been an inmate at MDC Brooklyn since February 13, 2015 and his anticipated release date is February 17, 2019.

65. Every meal Mr. Crespo consumes is provided by MDC Brooklyn and the vast majority of meals have been eaten in the conditions described above.

66. Since February 13, 2015, Mr. Crespo has not once left MDC Brooklyn for recreation or work purposes.  Prior to August 3, 2017, he had not breathed fresh air, nor seen sunlight, but was instead been forced to constantly breathe the recycled, poor quality air alleged above.  Cadre now have intermittent access to a fenced-in basketball court but access is both arbitrarily curtailed and insufficient to mitigate the harms of MDC Brooklyn's polluted air.

67. On June 12, 2015, Mr. Crespo was informed by MDC Brooklyn Corrections Officer Mackler that he was to be taken to the Special Housing Unit ("SHU"), a unit generally used as punishment for infractions, in preparation for a colonoscopy that Mr. Crespo had twice previously cancelled.  Despite informing the corrections officer that he did not wish

to have a colonoscopy, the Corrections Officer Mackler threatened him with punishment and forced him to go to the SHU and prepare for the colonoscopy.[1]  Once in the SHU, Mr. Crespo again cancelled the colonoscopy in writing and should have been released immediately.  He was instead kept there for three days.  Mr. Crespo informed Corrections Officer Mackler that he had not been allowed to take his necessary medication. Instead of releasing him, MDC Brooklyn Nurse Brooks checked Mr. Crespo's blood sugar, found that it was high (289 mg/dL) and stated "you won't die" and that the "the computer is down, so I don't know if you will be released today as promised."  Mr. Crespo was not released that day and on the subsequent day, Nurse Brooks put a "Do Not Feed" sign on Mr. Crespo's door, despite her knowledge that Mr. Crespo was a diabetic.  Mr. Crespo was kept in solitary confinement, without food or necessary medications, for three days, where he experienced lethargy, dizziness, confusion and diabetic tremors, without any legitimate penological or medical justification.

68.    In May 2016, Mr. Crespo contracted an unknown infection, with symptoms of skin rashes, body aches, painful swelling and dizziness.  Despite multiple requests to be seen by MDC Brooklyn medical personnel over a period of weeks, Mr. Crespo was ignored by MDC Brooklyn medical personnel and ultimately fainted.  Mr. Crespo later learned that Nurse Brooks waited over an hour before calling an ambulance.  Eventually, Mr. Crespo was taken to NYU Langone Hospital – Brooklyn, before being transferred to Kingsbrook Jewish Medical Center.  Mr. Crespo was then given a seven-day course of antibiotics for an unknown infection.  His treating physician, Dr. Viplov Mehta, informed Mr. Crespo

---

[1] MDC Brooklyn's prisoners manual specifically noted that prisoners have the right to "refuse medical treatment." Metro. Det. Ctr., Brooklyn, N.Y., *Admission and Orientation Manual for Pre-Trial, and Holdover Inmates*, 9 (rev. ed. 2009), https://www.bop.gov/locations/institutions/bro/BRO_aohandbook.pdf.

that his infection was potentially caused by and likely to reoccur under the living

conditions of MDC Brooklyn.  Symptoms of the condition continue to reoccur.

69.    Through the actions and inactions of the Defendants in permitting the unconstitutionally

deficient living conditions of MDC Brooklyn and the intentional starvation and

deprivation of necessary medications by MDC Brooklyn personnel, Mr. Crespo suffered

a deprivation of his constitutional rights, physical injury and accompanying mental and

emotional harms.

**B. Pedro Espada, Jr. (78764-053)**

70.    Mr. Espada was an inmate at MDC Brooklyn between approximately November 20, 2014

and April 3, 2017.  He resided in one of the Cadre units described above in paragraphs

43-45.

71.    Mr. Espada was classified as a minimum-security prisoner by the BOP.

72.    Mr. Espada has been diagnosed with asthma.

73.    Every meal Mr. Espada consumed during his incarceration at MDC Brooklyn was

provided by MDC Brooklyn and the vast majority of meals were eaten in the conditions

described above.

74.    Between entering MDC Brooklyn on approximately November 20, 2014 and being

released on April 3, 2017, Mr. Espada did not once leave MDC for recreation or work

purposes.  He did not breathe fresh air, nor see sunlight, but was instead forced to breathe

the recycled, poor-quality air alleged above.  Because of the continuous presence of

voluminous airborne particulate and complete lack of fresh air during his almost two and

half years of incarceration at MDC Brooklyn, Mr. Espada's asthma condition has noticeably worsened.

75.   Through the actions and inactions of the Defendants in permitting the unconstitutionally deficient living conditions of MDC Brooklyn, Mr. Espada suffered a deprivation of his constitutional rights, physical injury and accompanying mental and emotional harms.

**C. Anthony Podias (71145-054)**

76.   Mr. Podias was an inmate at MDC Brooklyn between April 4, 2016 and February 3, 2017.  He resided in one of the Cadre units described above in paragraphs 43-45.

77.   Mr. Podias was classified as a minimum-security prisoner by the BOP.

78.   Every meal Mr. Podias consumed during his incarceration at MDC Brooklyn was provided by MDC Brooklyn and the vast majority of meals were eaten in the conditions described above.

79.   During his incarceration at MDC Brooklyn, Mr. Podias was only permitted to briefly leave the MDC Brooklyn building to dispose of garbage as part of a work detail.  Mr. Podias did not once leave MDC Brooklyn for recreation purposes.  Besides his minimal work outside of the facility, Mr. Podias was forced to continuously breathe the recycled, poor-quality air alleged above.

80.   During his incarceration at MDC Brooklyn, Mr. Podias was assigned to plumbing, electrical and HVAC work details.  During these work details, Mr. Podias was not provided with masks or work gloves, despite working with feces and chemicals.  When Mr. Podias and other Cadre requested gloves and masks, their supervisors told them that

there were none available.  During one of these work details, because he was not provided with gloves, Mr. Podias received a serious cut to this hand on jagged metal. Despite multiple requests for medical assistance and substantial bleeding, Mr. Podias went untreated for over an hour, during which time he fainted from blood loss.

81.   Through the actions and inactions of the Defendants in permitting the unconstitutionally deficient living conditions of MDC Brooklyn, Mr. Podias suffered a deprivation of his constitutional rights, physical injury and accompanying mental and emotional harms.

**D. Kesnel Juste (66663-019)**

82.   Mr. Juste was an inmate at MDC Brooklyn between August 11, 2015 and April 25, 2017. He resided in one of the Cadre units described above in paragraphs 43-45.

83.   Mr. Juste was classified as a minimum-security prisoner by the BOP.

84.   Every meal Mr. Juste consumed during his incarceration at MDC Brooklyn was provided by MDC Brooklyn and the vast majority of meals were eaten in the conditions described above.

85.   Between entering MDC Brooklyn on August 11, 2015 and being transferred on April 25, 2017, Mr. Juste was only briefly permitted to leave MDC Brooklyn in order to travel from one building of MDC Brooklyn to another during his work detail.  Mr. Juste did not once leave MDC Brooklyn for recreation purposes.  Besides his minimal work requiring outside travel, Mr. Juste was forced to continuously breathe the recycled, poor-quality air alleged above.

86. In early 2016, Mr. Juste began regularly bleeding from his anus. Despite repeated medical requests, Mr. Juste was not seen by MDC Brooklyn medical personnel for almost two months.  After finally receiving an appointment, Mr. Juste was seen by MDC Brooklyn medical personnel but was not provided with a diagnosis or treatment.  Mr. Juste continued to suffer from anal bleeding and continued to ask for treatment.  After several more months, Mr. Juste was seen again by MDC Brooklyn medical personnel. Mr. Juste provided a blood sample but never heard back from MDC Brooklyn medical personnel about the results, nor did he receive treatment.  Mr. Juste's anal bleeding continued through the duration of his incarceration at MDC Brooklyn and, upon his transfer to FCI Miami, was almost immediately diagnosed and treated as hemorrhoids.

87. Through the actions and inactions of the Defendants in permitting the unconstitutionally deficient living conditions of MDC Brooklyn, Mr. Juste suffered a deprivation of his constitutional rights, physical injury and accompanying mental and emotional harms

**E. Anthony Joseph (83438-053)**

88. Mr. Joseph was an inmate at MDC Brooklyn between June 20, 2016 and December 15, 2016.  He resided in one of the Cadre units described above in paragraphs 43-45.

89. Mr. Joseph was classified as a minimum-security prisoner by the BOP.

90. Every meal Mr. Joseph consumed during his incarceration at MDC Brooklyn was provided by MDC Brooklyn and the vast majority were eaten in the conditions described above.

27

91.	Between entering MDC Brooklyn on June 20, 2016 and being released on December 15, 2016, Mr. Joseph did not once leave MDC for recreation or work purposes.  While incarcerated at MDC Brooklyn, he did not breathe fresh air, nor see sunlight, but was instead forced to breathe the recycled, poor-quality air alleged above.

92.	On April 21, 2016, prior to self-surrendering to BOP custody at MDC Brooklyn, Mr. Joseph suffered a transient ischemic attack, also known as a mini-stroke.  Upon his self-surrender on June 20, 2016, Mr. Joseph informed an unknown MDC Brooklyn physician that he was still undergoing follow-up treatment at Nassau University Medical Center for his mini-stroke.  This physician then told Mr. Joseph that his scheduled neurological treatment was not important and that he would be unable to keep his appointments.

93.	Several weeks after Mr. Joseph was denied treatment by MDC Brooklyn medical personnel, he began bleeding from both of his ears.  Mr. Joseph's repeated requests for medical attention were ignored for several weeks.  Upon finally receiving an appointment, the MDC Brooklyn physician merely took Mr. Joseph's vitals and sent him back to his unit.  Mr. Joseph then began feeling dizzy and requested medical attention, but was forced to wait several weeks for an appointment and was then seen and released without treatment by an MDC Brooklyn physician.

94.	In September 2016, Mr. Joseph fainted but was ignored by MDC Brooklyn personnel and did not receive medical attention. In October 2016, Mr. Joseph fainted again but was on that occasion taken by ambulance to NYU Langone Hospital, before being transferred to Kingsbrook Jewish Medical Center, where Mr. Joseph stayed for ten days. Upon his release, Mr. Joseph still suffered from dizziness and other symptoms.

95.   Mr. Joseph has been diagnosed as a diabetic with high blood pressure and was frequently given food by MDC Brooklyn that was inappropriate for his condition, exacerbating his symptoms.  Additionally, the food he was provided was frequently visibly contaminated by vermin bites and debris.  He was therefore unable to eat much of the provided food, which also exacerbated his medical condition.  As a result, Mr. Joseph suffered from nausea and diarrhea for months, and his frequent complaints and requests for medical attention were ignored by MDC Brooklyn corrections officers and medical personnel.

96.   Through the actions and inactions of the Defendants in permitting the unconstitutionally deficient living conditions of MDC Brooklyn, Mr. Joseph suffered a deprivation of his constitutional rights, physical injury and accompanying mental and emotional harms

**F. Rolfi Espinal (97951-038)**

97.   Mr. Espinal was an inmate at MDC Brooklyn between August 30, 2016 and September 26, 2017.  He resided in one of the Cadre units described above in paragraphs 43-45 between August 3, 2017 and September 26, 2017 and resided in one the Cadre units described above in paragraphs 46-50 between August 30, 2016 and August 3, 2017.

98.   Mr. Espinal was classified as a minimum-security prisoner by the BOP.

99.   Every meal Mr. Espinal consumed during his incarceration at MDC Brooklyn was provided by MDC Brooklyn and the vast majority of meals were eaten in the conditions described above.

100.  Between August 30, 2016 and August 3, 2017, Mr. Espinal saw the sun and breathed fresh air on four occasions, for approximately five minutes per occasion, as part of a

29

garbage disposal detail.  These twenty minutes of fresh air and sunlight as part of a work detail could not offset the otherwise constant exposure to the recycled, poor-quality air alleged above.  Cadre now have intermittent access to a fenced-in basketball court but access is both arbitrarily curtailed and insufficient to mitigate the harms of MDC Brooklyn's polluted air.

101.  Beginning on January 3, 2017, Mr. Espinal repeatedly sought treatment for an ingrown toenail and accompanying staphylococcus aurous ("staph") infection.  Although twice prescribed antibiotics by MDC Brooklyn medical personnel, on January 3, 2017 and February 1, 2017, Mr. Espinal was never provided with the prescribed foot powder or basin ordered by Gina Duncan, a MDC Brooklyn Family Nurse Practitioner in charge of his care.  On February 1, 2017, Ms. Duncan referred Mr. Espinal for outside podiatry care but Mr. Espinal waited over a month before MDC Brooklyn scheduled the appointment, during which time Mr. Espinal was in severe pain.

102.  Ms. Duncan, on February 14, 2017, ordered that Mr. Espinal be given work convalescence until March 1, 2017 and that he not be assigned work that required him to wear "safety shoes" until August 13, 2017.  Despite this medical instruction, Mr. Espinal was forced, under threat of being sent to the punitive Special Housing Unit, by MDC Brooklyn corrections officers to work as an orderly in a position which required him to wear safety shoes, compounding his medical condition and causing him substantial pain.

103.  Through the actions and inactions of the Defendants in permitting the unconstitutionally deficient living conditions of MDC Brooklyn, Mr. Espinal suffered a deprivation of his constitutional rights, physical injury and accompanying mental and emotional harms.

30

## COMPLIANCE WITH ADMINISTRATIVE REMEDIES REQUIREMENTS

### A. Deficient Medical Care

104.    On April 21, 2017, Mr. Crespo filed an "Inmate Request For Informal Resolution" form, also known as a "BP-8.5", detailing the allegations set forth in paragraphs 35-37 above with Counselor S. Bennett.  Prior to April 21, 2017, Mr. Crespo made repeated oral complaints to multiple MDC Brooklyn guards and staff members regarding these issues, without any resolution.

105.    Mr. Crespo did not receive any response to his April 21, 2017 BP-8.5 and on May 5, 2017 filed a "Request for Administrative Remedy" form, also known as a "BP-9" with the Defendant Warden Quay's office.  On May 9, 2017, Defendant Warden Quay summarily rejected Mr. Crespo's remedy request on the grounds of insufficient detail and failure to pursue informal resolution. Yet, Mr. Crespo's request was both clear and concise in its request for administrative remedy and Mr. Crespo had pursued informal remedy, both orally and through the BP-8.5, which Defendant Warden Quay's office stapled to the very rejection notice in which he claimed that the BP-8.5 did not exist.

106.    Because this response did nothing to address the unconstitutional living conditions detailed in the BP-8.5, BP-9 and paragraphs 35-37 above, Mr. Crespo filed a "Regional Administrative Remedy Appeal" form, also known as a "BP-10", with Defendant Director Carvajal's office on May 23, 2017.  Defendant Director Carvajal summarily rejected Mr. Crespo's appeal on May 31, 2017, on the grounds that he "[c]oncur[red] with rationale of regional office and/or institution for rejection."

107.    Because this response did nothing to address the unconstitutional living conditions

detailed in the BP-8.5, BP-9, BP-10 and paragraphs 35-37 above, Mr. Crespo filed a

"Central Office Administrative Remedy Appeal" form, also known as a "BP-11", with

the BOP Administrative Remedy Coordinator, Central Office (the "ARC"), on June 12,

2017. The ARC summarily rejected Mr. Crespo's appeal on July 5, 2017, noting that they

"[c]oncur[red] with rationale of regional office and/or institution for rejection." The ARC

also noted that "You submitted your request or appeal to the wrong level. You should

have filed at the institution office level." The ARC gave this reason for rejection despite

the fact that multiple copies of the BP-8.5, BP-9, BP-10 and BP-11 forms were stapled,

by the ARC, to the ARC's response. The ARC further remarked that Mr. Crespo should

"Get help from unit team regarding how to clarify your reason and use informal

resolution first." Again, the ARC wrote this despite the fact that multiple copies of the

BP-8.5 form, which is entitled "Inmate Request For Informal Resolution", as well as the

BP-9 and BP-10 forms, were stapled by the ARC to the ARC's response.

108.    Pursuant to Administrative Remedy Program, 28 C.F.R. § 542.15 (2005), the BP-11 is

the final level of the Administrative Remedy Program and the ARC's rejection of Mr.

Crespo's BP-11 on July 5, 2017 fulfilled any applicable Administrative Remedy

requirements for the allegations set forth in paragraphs 35-37.

**B. Inhumane Cadre Housing Conditions**

109.    On April 21, 2017, Mr. Crespo filed an "Inmate Request For Informal Resolution" form,

also known as a "BP-8.5," detailing the allegations set forth in paragraphs 43-50 above

with Counselor S. Bennett, who forwarded the form to "Facilities" on April 25, 2017.  On

April 26, 2017, John Maffeo, Acting Facilities Manager, responded that he had reviewed

the matter, that lights were within the control of the unit officers and that "the air

handling units that serve 3 south receive the required maintenance as per manufactures

(sic) recommendation and Bureau standards.  The maintenance includes the replacement

of the air filters."

110.    As this response did nothing to address the unconstitutional living conditions detailed in

the BP-8.5 and paragraphs 43-50 above, Mr. Crespo then filed a "Request for

Administrative Remedy" form, also known as a "BP-9" with the Defendant Warden

Quay's office on May 5, 2017.  Defendant Warden Quay summarily rejected Mr.

Crespo's remedy request on May 9, 2017 on the sole ground that the issues, which were

clearly and directly stated on the BP-8.5 and BP-9, lacked sufficient "specific

information" to consider the request.

111.    Because this response did nothing to address the unconstitutional living conditions

detailed in the BP-8.5, BP-9 and paragraphs 43-50 above, Mr. Crespo filed a "Regional

Administrative Remedy Appeal" form, also known as a "BP-10," with Defendant

Director Carvajal's office on May 23, 2017.  Defendant Director Carvajal summarily

rejected Mr. Crespo's appeal on May 31, 2017, on the grounds that he "[c]oncur[red]

with rationale of regional office and/or institution for rejection."

112.    Because this response did nothing to address the unconstitutional living conditions

detailed in the BP-8.5, BP-9, BP-10 and paragraphs 43-50 above, Mr. Crespo filed a

"Central Office Administrative Remedy Appeal" form, also known as a "BP-11," with

BOP Administrative Remedy Coordinator, Central Office (the "ARC"), on June 12,

2017.  The ARC summarily rejected Mr. Crespo's appeal on July 5, 2017, noting that

they "[c]oncur[red] with rationale of regional office and/or institution for rejection."  The
ARC also wrote that "You submitted your request or appeal to the wrong level. You
should have filed at the institution office level." The ARC gave this reason for rejection
despite the fact that multiple copies of the BP-8.5, BP-9, BP-10 and BP-11 forms were
stapled, by the ARC, to the ARC's response.

113.    Pursuant to Administrative Remedy Program, 28 C.F.R. § 542.15 (2005), the BP-11 is
the final level of the Administrative Remedy Program and the ARC's rejection of Mr.
Crespo's BP-11 on July 5, 2017 fulfilled any applicable Administrative Remedy
requirements for the allegations set forth in paragraphs 43-50.

**C. Lack of Fresh Air and Sunlight**

114.    On April 21, 2017, Mr. Crespo filed an "Inmate Request For Informal Resolution" form,
also known as a "BP-8.5", detailing the allegations set forth in paragraphs 53-56 above
with Counselor S. Bennett, who forwarded the form to the "Recreation" department on
April 25, 2017.  Mr. Crespo's request was summarily rejected on the non-responsive
grounds that "[t]he Recreation department is not eligible to approve programs outside the
perimeter of the institution."

115.    As this response did nothing to address the unconstitutional living conditions detailed in
the BP-8.5 and paragraphs 53-56 above, Mr. Crespo then filed a "Request for
Administrative Remedy" form, also known as a "BP-9," with the Defendant Warden
Quay's office on May 5, 2017.  Defendant Warden Quay responded on May 17, 2017 that
Mr. Crespo had been classified a "Low" security inmate and addressed none of the
substantive concerns raised in Mr. Crespo's BP-9.

116.    As this response did nothing to address the unconstitutional living conditions detailed in the BP-8.5, BP-9 and paragraphs 53-56 above, Mr. Crespo then filed a "Regional Administrative Remedy Appeal" form, also known as a "BP-10," with Defendant Director Carvajal's office on May 19, 2017.

117.    On June 26, 2017, having not received a response from Defendant Director Carvajal's office within the thirty day period specified by Administrative Remedy Program, 28 C.F.R. § 542.18 (2005), Mr. Crespo filed a  "Central Office Administrative Remedy Appeal" form, also known as a "BP-11," with the BOP Administrative Remedy Coordinator, Central Office (the "ARC").

118.    On June 28, 2017, after the period mandated by 28 C.F.R. § 542.18 (2005) had elapsed, Mr. Crespo received a response from Defendant Director Carvajal, which agreed with Defendant Warden Quay's classification of Mr. Crespo as a minimum-security inmate and did not address any of his substantive concerns.

119.    On July 11, 2017, Mr. Crespo filed a supplementary BP-11 with the ARC, which referenced the previous BP-11 filing on the issues raised in paragraphs 53-56 and the previously filed BP-8.5, BP-9 and BP-10 and attached Defendant Director Carvajal's June 28, 2017 response.

120.    On July 14, 2017, the ARC rejected Mr. Crespo's appeal, on the sole grounds that he did not provide a copy of the BP-10 response from Defendant Director Carvajal.  This rejection came despite the fact that Mr. Crespo's BP-10 clearly stated that he had not received a response from Defendant Director Carvajal within the mandated period.

121.   On July 26, 2017, the ARC rejected Mr. Crespo's July 11, 2017 BP-11, on the grounds that he had not submitted the required BP-9 and BP-10 forms.  Mr. Crespo had in fact submitted these forms, as they were attached to the ARC's July 14, 2017 rejection of Mr. Crespo's BP-11, and Mr. Crespo's July 11, 2017 BP-11 referred to that.

122.   On August 10, 2017, Mr. Crespo, pursuant to the instructions of the ARC's July 26, 2017 rejection, resubmitted his June 28, 2017 and July 11, 2017 BP-11s, along with the ARC's July 14 and 26, 2017 rejections.

123.   On August 21, 2017, the ARC acknowledged receipt of Mr. Crespo's August 10, 2017 BP-11.  The ARC further responded that "Additional time is needed to respond to the Central Office Appeal identified below. We are extending the time for response as provided for in the Administrative Remedy Program Statement."  The ARC's response was due October 20, 2017, according to the ARC's August 21, 2017 response.

124.   As of October 20, 2017, the deadline acknowledged by the ARC office required by 28 C.F.R. § 542.18 (2005), the ARC had not further responded to Mr. Crespo's request, which, pursuant to 28 C.F.R. § 542.18 (2005), constitutes a denial of the request.

125.   Pursuant to Administrative Remedy Program, 28 C.F.R. § 542.15 (2005), the BP-11 is the final level of the Administrative Remedy Program and the ARC's rejection of Mr. Crespo's BP-11 on July 14, 2017 and July 26, 2017 and/or the ARC's failure to respond by October 20, 2017 fulfilled any applicable Administrative Remedy requirements for the allegations set forth in paragraphs 53-56.

**D. Deficient Food Services**

126.    On April 21, 2017, Mr. Crespo filed an "Inmate Request For Informal Resolution" form, also known as a "BP-8.5", detailing the allegations set forth in paragraphs 57-60 above with Counselor S. Bennett, who forwarded the form to "Food Services."  On April 25, 2017, Food Services responded that they had performed "a thorough inspection of the serving area" without finding any droppings or other hazards.  They further stated that "Food Service has a comprehensive control plan in this institution."  Despite these claims, Mr. Crespo and other members of the Injunctive Relief Class continue to observe signs of vermin in the food itself and the preparation areas.

127.    As this response did nothing to address the unconstitutional living conditions detailed in the BP-8.5 and paragraphs 57-60 above, Mr. Crespo then filed a "Request for Administrative Remedy" form, also known as a "BP-9" with the Defendant Warden Quay's office on May 5, 2017.  On May 24, 2017, Defendant Warden Quay responded that an inspection of the Food Service Department had been performed the week of May 11, 2017, with no pest control issues observed, and that an outside contractor provided monthly pest control services. Despite this assertion by Defendant Warden Quay, Mr. Crespo and other members of the Injunctive Relief Class continued to observe signs of vermin in the food itself and the preparation areas.

128.    As this response did nothing to address the unconstitutional living conditions detailed in the BP-8.5, BP-9 and paragraphs 57-60 above, Mr. Crespo then filed a "Regional Administrative Remedy Appeal" form, also known as a "BP-10", with Defendant Director Carvajal's office on May 25, 2017.

37

129.    On June 26, 2017, having not received a response from Defendant Director Carvajal's office within the thirty day period specified by Administrative Remedy Program, 28 C.F.R. § 542.18 (2005), Mr. Crespo filed a  "Central Office Administrative Remedy Appeal" form, also known as a "BP-11", with the BOP Administrative Remedy Coordinator, Central Office (the "ARC").

130.    On June 30, 2017, Defendant Director Carvajal rejected Mr. Crespo's request.  He further responded that pest control service had been provided by "Alleycat Exterminating Company" on June 1, 2017 and that he had been informed by the Environmental and Safety Compliance Administrator that no reports of pest or vermin infestation had been made about the food service areas.

131.    On July 11, 2017, Mr. Crespo forwarded Defendant Director Carvajal's rejection, along with a supplementary BP-11, which specifically referenced the previous BP-11, to the ARC.

132.    On July 14, 2017, the ARC rejected Mr. Crespo's appeal, on the sole grounds that he did not provide a copy of the BP-10 response from Defendant Director Carvajal.  This rejection came despite the fact that Mr. Crespo's BP-10 clearly stated that he had not received a response from Defendant Director Carvajal within the mandated period.

133.    On July 26, 2017, the ARC rejected Mr. Crespo's July 11, 2017 BP-11, on the grounds that he had not submitted the required BP-9 and BP-10 forms.  Mr. Crespo had in fact submitted these forms, as they were attached to the ARC's July 14, 2017 rejection of Mr. Crespo's BP-11, and Mr. Crespo's July 11, 2017 BP-11 specifically referred to that fact.

134.    On August 10, 2017, Mr. Crespo, pursuant to the instructions of the ARC's July 26, 2017 rejection, resubmitted his June 28, 2017 and July 11, 2017 BP-11s, along with the ARC's July 14 and 26, 2017 rejections.

135.    On August 21, 2017, the ARC acknowledged receipt of Mr. Crespo's August 10, 2017 BP-11.  The ARC further responded that "Additional time is needed to respond to the Central Office Appeal identified below. We are extending the time for response as provided for in the Administrative Remedy Program Statement."  The ARC's response was due October 20, 2017, according to the ARC's August 21, 2017 response.

136.    In a response dated September 5, 2017, Ian Connors, Administrator of National Inmate Appeals, denied Mr. Crespo's BP-11 request, noting that he "concur[red] with the manner in which the Warden and Regional Director responded to your concerns at the time of your Request for Administrative Remedy and subsequent appeal."

137.    Pursuant to Administrative Remedy Program, 28 C.F.R. § 542.15 (2005), the BP-11 is the final level of the Administrative Remedy Program and the ARC's rejection of Mr. Crespo's BP-11 on July 14, 2017 and July 26, 2017 and/or Ian Connor's September 5, 2017 rejection fulfilled any applicable Administrative Remedy requirements for the allegations set forth in paragraphs 57-60.

**E. Plaintiff Crespo's June 12, 2015 Starvation Incident**

138.    On April 21, 2017, Mr. Crespo filed an "Inmate Request For Informal Resolution" form, also known as a "BP-8.5", detailing the allegations set forth in paragraph 67 above with Counselor S. Bennett.  Prior to April 21, 2017, Mr. Crespo made repeated oral and written complaints to multiple MDC Brooklyn guards and staff members regarding these

39

issues, without any resolution. On April 25, 2017, Counselor S. Bennett forwarded the BP-8.5 to "Medical" but Mr. Crespo did not receive a response from that department.

139. On May 5, 2017, having not received a response to his April 21, 2017 BP-8.5 and previous oral and written complaints, Mr. Crespo filed a "Request for Administrative Remedy" form, also known as a "BP-9" with the Defendant Warden Quay's office on May 5, 2017. On May 9, 2017, Defendant Warden Quay rejected Mr. Crespo's request, noting "you submitted your request or appeal to the wrong level" and that Mr. Crespo "must submit a tort claim for compensatory damages."

140. Defendant Warden Quay rejected Mr. Crespo's request despite the fact that the proper BP-8.5 was attached to his rejection and that the Administrative Remedy structure provides for no other administrative level between informal resolution and the BP-9 filed with his office. Additionally, The Federal Tort Claims Act (June 25, 1946, ch. 646, Title IV, 60 Stat. 812, "28 U.S.C. Pt.VI Ch.171" and 28 U.S.C. § 1346(b)) ("FTCA") does not apply to actions brought as constitutional violations, 28 U.S.C. § 2679(b)(2)(A), which Mr. Crespo's BP-8.5 and BP-9 clearly alleged.

141. Because this response did nothing to address the unconstitutional living conditions detailed in the BP-8.5, BP-9 and paragraph 67 above, Mr. Crespo filed a "Regional Administrative Remedy Appeal" form, also known as a "BP-10", with Defendant Director Carvajal's office on May 23, 2017. On May 31, 2017, Defendant Director Carvajal rejected Mr. Crespo's appeal, on the grounds that he "must first file a BP-9 request through the institution for the warden's review and response before filing an appeal at this level." The BP-9 and Defendant Warden Quay's rejection were in fact

stapled to Defendant Director Carvajal's response, which again wrongly claimed that the documents attached to it did not exist.

142. On June 12, 2017, Mr. Crespo, attempting to comply with Defendant Director Carvajal's demands for documents that were attached to the demand itself, submitted an additional BP-10, reattaching the BP-9 and Defendant Warden Quay's May 9, 2017 response. On June 20, 2017, Defendant Director Carvajal once again rejected Mr. Crespo's appeal, on the same grounds as his May 31, 2017 rejection. As it was before, the demanded BP-9 and Defendant Warden Quay's response was still stapled to the rejection that claimed they were missing.

143. Because this response did nothing to address the unconstitutional living conditions detailed in the BP-8.5, BP-9, BP-10 and paragraphs 67 above, Mr. Crespo filed a "Central Office Administrative Remedy Appeal" form, also known as a "BP-11", with the BOP Administrative Remedy Coordinator, Central Office (the "ARC"), on June 28, 2017. On July 17, 2017, the ARC rejected Mr. Crespo's BP-11, noting that he "concur[red] with rationale of regional office." Pursuant to Administrative Remedy Program, 28 C.F.R. § 542.15 (2005), the BP-11 is the final level of the Administrative Remedy Program and the ARC's rejection of Mr. Crespo's BP-11 on July 17, 2017 fulfilled any applicable Administrative Remedy requirements for the allegations set forth in paragraph 67.

## CAUSES OF ACTION

### Count I: Eighth Amendment – Damages Class

144.    Plaintiffs, on behalf of themselves and the Damages Class, incorporate paragraphs 1

through 143 as if fully set forth herein.

145.    Defendants Regional Director Carvajal, Warden Quay, former Warden Ask-Carlson,

Health Services Administrator Travers and former Food Services Administrator Decker,

in their personal capacities, through deliberate indifference to known and obvious needs,

deprived the Plaintiffs and members of the Damages Class of their Eighth Amendment

rights to constitutionally adequate medical care, living conditions and food.

146.    As a result of the Defendants' actions and inactions, Plaintiffs and the Damages Class

suffered violations of their Eighth Amendment constitutional rights and physical injury,

and accompanying emotional and mental harms, and are therefore entitled to declaratory

relief and compensatory, nominal and punitive damages.

### Count II: Eighth Amendment – Injunctive Relief Class

147.    Plaintiff Crespo on behalf of himself and the Injunctive Relief Class, incorporate

paragraphs 1 through 143 as if fully set forth herein.

148.    Defendants Acting Director Hurwitz, Regional Director Carvajal, Warden Quay, Health

Services Administrator Travers and Food Services Administrator Comer, in their official

capacities and under the color of federal law, through deliberate indifference to known

and obvious needs, have deprived and will continue to deprive Plaintiff Crespo and the

Injunctive Relief Class of their Eighth Amendment rights to constitutionally adequate

medical care, living conditions and food.

149.    As a result of the Defendants' actions and inactions, Plaintiff Crespo and the Injunctive

Relief Class have suffered and will continue to suffer violations of their Eighth

Amendment constitutional rights and physical injury, and accompanying emotional and

mental harms, and are therefore entitled to injunctive and declaratory relief, as well as

costs and attorneys' fees.

## RELIEF SOUGHT

Plaintiffs request that this Court:

(1) Certify this action as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and Fed. R.

Civ. P. 23(b)(3);

(2) Enter a declaratory judgment finding that Defendants' failure to provide adequate

medical care, living conditions and food violated the Eighth Amendment of the U.S.

Constitution;

(3) Award the Injunctive Relief Class a permanent injunction compelling Defendants to

correct the deficient conditions alleged in this complaint and to provide adequate medical care,

living conditions and food for all current and future Cadre at MDC Brooklyn by, among other

things:

a.    Requiring that Defendants implement and maintain applicable medical, sanitary

and living conditions as required by MDC Brooklyn's internal regulations, BOP

policies and Guidelines and any applicable accreditation standards, including

those established by the National Commission on Correctional Health Care and

the Commission on Accreditation for Corrections;

b.    Requiring that Cadre be provided non-emergency health care within two weeks

and that emergency care be available within an hour;

43

c.  Requiring all Corrections Officers under the control and supervision of the Defendants to follow health care providers' instructions and orders regarding the treatment of Cadre;

d.  Prohibiting Corrections Officers from determining whether or not Cadre are provided with access to health care providers;

e.  Requiring adequate maintenance and cleaning of Cadre housing units;

f.  Prohibiting the arbitrary restriction of Cadre's access to water for toiletry/hygiene needs;

g.  Prohibiting the arbitrary restriction of Cadre's access to the basketball court, their sole source of fresh air and sunlight;

h.  Requiring weekly exterminator inspections of all food storage, preparation and serving areas;

i.  Prohibiting the serving of expired, moldy or vermin contaminated food;

j.  Providing meals fit for human consumption that fulfill Cadre dietary restrictions imposed by medical personnel.

(4) Appoint an independent monitor to oversee compliance with the permanent injunction for a period of five years;

(5) Award the Damages Class compensatory, nominal and punitive damages;

(6) Award the Injunction Relief Class costs, including reasonable attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412;

(7) Allow such other and future relief as the Court may deem proper and equitable.

/s/ Eric S. Hochstadt
_____

Eric S. Hochstadt
Kaj Rozga
David F. Hill, IV
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Pro Bono Counsel for Plaintiffs*
*David Crespo, Pedro Espada, Jr.,*
*Anthony Podias, Anthony Joseph,*
*Kesnel Juste and Rolfi Espinal*

45