UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
DAVID CRESPO, ANTHONY PODIAS,            :
PEDRO ESPADA, JR., ROLFI ESPINAL,        :
KESNEL JUSTE, and ANTHONY JOSEPH, on     :
their own behalf, and on behalf of two classes of  :
similarly situated prisoners,            :
                                         :
                    Plaintiffs,          :
                                         :
           -against-                     :
                                         :
HUGH HURWITZ, MICHAEL CARVAJAL,          :
HERMAN QUAY III, KIMBERLY ASK-           :
CARLSON, GERARD TRAVERS, WAYNE           :
DECKER, and MARY LOU COMER,              :
                                         :
                    Defendants.          :
------------------------------------------------------------------ X

**REPORT AND
RECOMMENDATION**

17-cv-6329 (RRM)(PK)

**Peggy Kuo, United States Magistrate Judge:**

　　Plaintiffs David Crespo, Anthony Podias, Pedro Espada, Jr., Rolfi Espinal, Kesnel Juste, and

Anthony Joseph (collectively, "Plaintiffs"), who are former inmates at the Metropolitan Detention

Center Brooklyn ("MDC Brooklyn"), bring this putative class action against federal officials

Kimberly Ask-Carlson, Michael Carvajal, Wayne Decker, Herman Quay III, Gerard Travers, Hugh

Hurwitz, and Mary Lou Comer (collectively, "Defendants") alleging that their Eighth Amendment

rights were infringed because of deficient medical care, inhumane housing conditions, lack of fresh

air and sunlight, and deficient food services.  (*See* Am. Compl., Dkt. 34.)  In Count I of the

Amended Complaint, Plaintiffs sue Defendants Carvajal, Quay, Ask-Carlson, Travers, and Decker

("Individual Defendants") in their individual capacities, seeking monetary damages under *Bivens v.

Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).[1]  In Count II, Plaintiffs

---

[1] Plaintiffs only set forth one *Bivens* cause of action in their Amended Complaint, which purports to
encapsulate all of their alleged mistreat in MDC Brooklyn.  (*See* Am. Compl. ¶¶ 144-46.)  However, the

sue Defendants Hurwitz, Carvajal, Quay, Travers, and Comer ("Official Defendants") in their official capacities, seeking injunctive relief compelling them to correct the deficient conditions alleged in the Amended Complaint. (Am. Compl. at 43-44; *see also id.* ¶¶ 144-49.) Before the undersigned on referral from the Honorable Roslynn R. Mauskopf is Defendants' Motion to Dismiss, or, In The Alternative, For Partial Summary Judgment (the "Motion"). (*See* Dkt. 47; May 21, 2018 Order.) For the following reasons, the undersigned respectfully recommends that the Motion be granted in part and denied in part.

## FACTUAL BACKGROUND

The following facts are taken from the Amended Complaint and are assumed to be true for the purpose of this Motion. *Kalnit v. Eichler*, 264 F.3d 131, 135 (2d Cir. 2001).

MDC Brooklyn is one of the institutions of the Federal Bureau of Prisons ("BOP"). (Am. Compl. ¶ 1.) Over ninety percent of MDC Brooklyn's inmate population is comprised of high-security inmates who are intended to be held there temporarily, while awaiting trial. (*Id.* ¶ 2.) Some minimum-security sentenced male prisoners, generally referred to as "Cadre," are also held there. (*Id.* ¶ 1.)

Plaintiffs are former Cadres at MDC Brooklyn. Plaintiffs were incarcerated at MDC Brooklyn during the following periods: Crespo, from February 13, 2015 to around February 17, 2019 (*id.* ¶ 10); Espada, from around November 20, 2014 to April 3, 2017 (*id.* ¶ 11); Podias, from April 4, 2016 to February 3, 2017 (*id.* ¶12); Juste, from August 11, 2015 to April 25, 2017 (*id.* ¶ 13); Joseph, from June 20, 2016 to December 15, 2016 (*id.* ¶ 14); and Espinal, from August 30, 2016 to September 26, 2017 (*id.* ¶ 15).

---

undersigned will construe the Amended Complaint as asserting four *Bivens* claims, each premised on separate factual allegations: deficient medical care; inhumane housing conditions; lack of fresh air and sunlight; and deficient food services. This also comports with the parties' arguments in support of and opposition to the Motion.

Defendants are employees of either MDC Brooklyn or the BOP. Specifically, Hurwitz has been the Acting Director of the BOP since May 18, 2018. (*Id.* ¶ 16.) Carvajal has been the Director of the Northeast Region of the BOP since July 10, 2016. (*Id.* ¶ 17.) Quay has been the Warden of MDC Brooklyn since December 2015. (*Id.* ¶ 18.) Ask-Carlson was the Warden of MDC Brooklyn from February 2014 until December 2015. (*Id.* ¶ 19.) Travers has been the Health Systems Administrator of MDC Brooklyn since July 2015. (*Id.* ¶ 20.) Decker was the Food Service Administrator of MDC Brooklyn from October 2015 until approximately September 2017. (*Id.* ¶ 21.) Comer has been the Food Service Administrator of MDC Brooklyn since September 2017. (*Id.* ¶ 22.)

The Amended Complaint includes allegations about the treatment of the Cadres generally and each Plaintiff specifically.

A. Allegations Applicable to All Cadres, Including Plaintiffs

1. Allegations Related to Inhumane Housing Conditions

From October 31, 2014 to August 3, 2017, Plaintiffs and other Cadres were housed in two similar adjacent units ("Old Units"), which were "entirely cut off from sunlight and fresh air." (*Id.* ¶ 43; *see also id.* ¶ 23 (b).) Air was provided through a ventilation system "that was last thoroughly cleaned in 2014," "appeared to contain mold," and had vents which were "visibly clogged and infested with unknown matter." (*Id.* ¶ 43.) The mattresses where inmates sleep were often stained with urine and feces. (*Id.* ¶ 44.) A 4.5-foot wall separated the toilet and shower area from the living and eating area, thus allowing fecal, urine, and other particulate matter to circulate throughout each Old Unit. (*Id.*) Similarly, the dryers located in each of the Old Units were in almost constant use, venting directly into the units and releasing particulate matter into the air. (*Id.* ¶ 45.)

On August 3, 2017, Plaintiffs and other Cadres were relocated to new cellblocks in a different building within MDC Brooklyn ("New Units"). (*Id.* ¶ 46.) Mattresses in the New Units are

also stained with urine and feces (*id.* ¶ 47), and the dryers also vent directly into the units, releasing particulate matter into the air (*id.* ¶ 49). The particulate matter is so voluminous that inmates "must place towels under their cell doors to reduce the amount blown into their individual cells." (*Id.* ¶ 50.) There are generally two inmates per cell in the New Units. (*Id.* ¶ 47.) Toilets are located in each cell, approximately five feet from the inmates' beds, and they do not have lids. (*Id.* ¶ 47.) MDC Brooklyn restricts how frequently inmates can flush their toilets and, therefore, feces and urine often remain in close proximity to inmates. (*Id.*) Additionally, on August 13 and 17, 2017, and on October 9, 2017, water access was completely shut off, and water access is completely shut off during lockdowns, which occur multiple times per week in the New Units. (*Id.* ¶ 48.)

### 2. Allegations Related to Lack of Fresh Air and Sunlight

Most inmates, including some Plaintiffs and other Cadres, had "no outside access whatsoever" in the Old Units. (*Id.* ¶ 53.) In the New Units, they have limited access to outdoor fenced-in basketball courts. (*Id.* ¶ 54.) The vast majority of Cadres "d[o] not see the sun or breathe fresh air until their release months or years" after entering MDC Brooklyn. (*Id.* ¶ 55.)

### 3. Allegations Related to Deficient Food Services

The food preparation areas "are habitually contaminated by the visible presence and droppings of rats, mice, cockroaches and flies." (*Id.* ¶ 58.) Such contamination is passed onto the food that inmates eat. (*Id.*) Moreover, the food served at MDC Brooklyn is "frequently spoiled and moldy, rendering it unfit for human consumption." (*Id.* at 59.) "Repeated complaints by inmates at MDC Brooklyn, include by Cadre, about spoiled and contaminated food at MDC Brooklyn have been documented since at least 2008." (*Id.*)

### 4. Allegations Related to Deficient Medical Care

"Corrections officers under the supervision and control" of Defendants "routinely deny" inmates "access to necessary medical care" and "threaten" them with punishment based on the

corrections officers' views that the inmates "are 'faking' their illness[es]." (*Id.* ¶ 36.)  When medical

care is provided, it is "unconstitutionally deficient," examinations are "cursory," and referrals to

specialists are "insufficient or non-existent." (*Id.* ¶ 37.)  Similarly, inmates cannot rehabilitate

properly because they are forced to work, even when medically excused, and medical facilities at

MDC Brooklyn are unsanitary. (*Id.*)  As an example of the "most egregious instance of this refusal

to provide proper medical care," Plaintiffs allege that inmate Francisco Gomez, who is not a named

plaintiff in this case, died as a result of a blood clot in his brain after being denied medical care for

more than 15 hours. (*Id.* ¶ 38.)

     5.   Allegations Related to Defendants' Knowledge of MDC Brooklyn's Conditions

Plaintiffs state that Defendants were aware of the deficient conditions at MDC Brooklyn in a

number of ways.  First, the awareness stems "from the inherent responsibility and authority of

[Defendants'] positions." (*Id.* ¶ 31.)  Second, the "local and national news organizations have

reported on the inhumane conditions at MDC Brooklyn." (*Id.* ¶ 34.)  Third, Ask-Carlson, Quay,

Travers, Decker, and Comer "participate[d] in a program called 'Main Line,'" in which "senior MDC

Brooklyn administrators and officials [met] with Cadre in their housing units and field[ed] questions

and complaints." (*Id.* ¶ 32.)  During these meetings, which are held approximately every other week,

"Cadre would raise issues . . . concerning [their] living conditions, deficient food and inadequate

medical care." (*Id.*)  Fourth, the National Association of Women Judges (the "NAWJ") Women in

Prison Committee issued "multiple reports,"[2] (*id.* ¶ 31) which "noted inhumane deficiencies in living

conditions, food quality, fresh air and sunlight access and medical care." (*Id.* ¶ 33.)  Although the

reports only discussed "conditions for female minimum-security inmates," the conditions described

"were substantively similar to those experienced by" the Cadres. (*Id.*)

---

[2] Although Plaintiffs state that the NAWJ issued "multiple reports," they only cite to one report in the
Amended Complaint. (Am. Compl. ¶ 31.)

**B.  Allegations Specific to Each Plaintiff**

On June 12, 2015, Crespo, who suffers from diabetes, was transferred to a Special Housing Unit ("SHU"), a unit generally used to punish inmates, in preparation for a colonoscopy that he had previously cancelled and did not wish to have.  (*Id.* ¶¶ 63, 67.)  After again cancelling the colonoscopy, he was kept in solitary confinement in the SHU for three days.  (*Id.* ¶ 67.)  During that period, he was not allowed to take his medications, about which he "informed Corrections Officer Mackler."  (*Id.*)  Crespo was also denied food and, as a result, he experienced "lethargy, dizziness, confusion and diabetic tremors."  (*Id.*)  Moreover, in May 2016, Crespo made multiple requests for medical assistance to treat symptoms of skin rashes, body aches, painful swelling, and dizziness, but he was ignored by MDC Brooklyn's medical personnel.  (*Id.* ¶ 68.)  He fainted and, more than an hour later, MDC Brooklyn's nurse called an ambulance.  (*Id.*)  At the second of the two hospitals to which he was taken, Crespo was prescribed antibiotics for an "unknown infection."  (*Id.*)  Dr. Viplov Mehta, the treating physician, informed Crespo that his infection was "potentially caused by and likely to reoccur under the living conditions of MDC Brooklyn."  (*Id.*)  Symptoms of the infection have recurred.  (*Id.*)

Espada has been diagnosed with asthma.  (*Id.* ¶ 72.)  During his time at MDC Brooklyn, his condition "noticeably worsened" as a result of the "voluminous airborne particulate" and the lack of fresh air.  (*Id.* ¶ 74.)  The Complaint does not allege that he sought medical attention for this condition.  (*See id.* ¶¶ 70-75.)

Podias received a "serious cut" to his hand from jagged metal while working on the plumbing, electrical, heating, ventilation, and air conditioning ("HVAC") details as part of his duties at MDC Brooklyn.  (*Id.* ¶ 80.)  Despite his requests for medical assistance, he fainted from blood loss after his cut remained untreated for over an hour.  (*Id.*)

Juste began regularly bleeding from his anus in early 2016. (*Id.* ¶ 86.) His requests for medical assistance were ignored for almost two months. (*Id.*) After he was seen, MDC Brooklyn personnel failed to give him a diagnosis or treatment. (*Id.*) After months of continuing symptoms, he was seen again by MDC Brooklyn medical personnel. (*Id.*) He provided a blood sample but was never given the results or a treatment. (*Id.*) He was later transferred to the Federal Correctional Institution, Miami, where he was "almost immediately" diagnosed and treated for hemorrhoids. (*Id.*)

Joseph suffered a transient ischemic attack, or a "mini-stroke," before being incarcerated. (*Id.* ¶ 92.) On June 20, 2016, upon his incarceration, he informed an MDC Brooklyn physician that he was undergoing follow-up treatment, but the physician told Joseph that "his scheduled neurological treatment was not important and that he would be unable to keep his appointments." (*Id.*) After he began bleeding from his ears, his requests for medical attention were ignored "for several weeks," until he finally received an appointment during which a physician "merely took [his] vitals and sent him back to his unit." (*Id.* ¶ 93.) Joseph began feeling dizzy and requested medical attention, but he had to wait "several weeks" for an appointment. Again, he was not provided any medical treatment as a result of that appointment. (*Id.*) Although he fainted in September 2016, Joseph did not receive medical treatment until he fainted again in October 2016. (*Id.* ¶ 94.) It was at that point that he was taken to a hospital, where he stayed for ten days. (*Id.*) "Upon his release" from the hospital, Joseph "still suffered from dizziness and other symptoms." (*Id.*) Joseph "has been diagnosed as a diabetic with high blood pressure," but he "was frequently given food by MDC Brooklyn that was inappropriate for his condition." (*Id.* ¶ 95.)

Beginning in January 2017, Espinal sought treatment for an ingrown toenail and accompanying "staphylococcus aureus" infection. (*Id.* ¶ 101.) MDC Brooklyn medical personnel

prescribed antibiotics and "foot powder" and a "basin,"[3] but he was never provided with the powder or the basin. (*Id.*)  In February 2017, an MDC Brooklyn nurse practitioner referred Espinal for outside podiatry care, but MDC Brooklyn did not schedule that appointment for over a month, during which time Espinal suffered "severe pain." (*Id.*)  Although the nurse practitioner ordered Espinal to "be given work convalescence" for two weeks and, once that time was over, "not be assigned work that required [Espinal] to wear safety shoes," he was forced, under threat of being sent to the SHU, to work in a position that required him to wear these shoes. (*Id.* ¶ 102.)  This "compound[ed] his medical condition and caus[ed] him substantial pain." (*Id.*)

## PROCEDURAL BACKGROUND

On October 31, 2017, Plaintiffs filed a Complaint (Dkt. 1), which was superseded by an Amended Complaint on July 6, 2018. (Dkt. 34.)  The Amended Complaint is styled as a putative class action and identifies two potential classes:  (1) a Damages Class comprised of "any male minimum-security sentenced inmates who were incarcerated at any point between October 31, 2014 and October 31, 2017 . . . at MDC Brooklyn;" and (2) an Injunctive Relief Class comprised of "any male minimum-security sentenced inmates incarcerated at MDC Brooklyn currently or in the future." (Am. Compl. ¶ 23.)  All Plaintiffs bring claims on behalf of themselves and the Damages Class (*id.* ¶ 144); only Plaintiff Crespo brings claims on behalf of himself and the Injunctive Relief Class. (*Id.* ¶ 147.)  Plaintiffs have not yet filed a motion to certify these classes.

A fully briefed Motion to Dismiss was filed on November 30, 2018. (Motion, Dkt. 47; Opp., Dkt. 48; Reply, Dkt. 49.)  Oral argument on the Motion on June 21, 2019. (*See* Oral Arg. Tr., Dkt. 55.)

---

[3] The Amended Complaint is unclear as to whether the antibiotics were separate from the foot powder and basin.

**LEGAL STANDARD**

Defendants bring the Motion pursuant to Federal Rules of Civil Procedure 12(b)(1),
12(b)(6), and 56.

Because "[s]overeign immunity is jurisdictional in nature," *Fed. Deposit Ins. Corp. v. Meyer*, 510
U.S. 471, 475 (1994), Defendants' arguments that this action should be dismissed on sovereign
immunity grounds are analyzed under Federal Rule of Civil Procedure 12(b)(1).  *See* Fed. R. Civ. P.
12(b)(1); *Dixon v. Zenk*, No. 05-CV-3127 (JG), 2007 WL 2403173, at *7 (E.D.N.Y. Aug. 20, 2007)
(evaluating under Rule 12(b)(1) whether the defendants in a *Bivens* suit are protected by sovereign
immunity such that the court lacks subject matter jurisdiction over them).  "Under Rule 12(b)(1), the
court must accept as true all material factual allegations in the complaint, but will not draw
inferences favorable to the party asserting jurisdiction."  *Dunster v. Fed. Bureau of Prisons*, No. 10-CV-
1735 (ARR)(LB), 2011 WL 2360353, at *2 (E.D.N.Y. June 9, 2011) (citations omitted).

Federal Rule of Civil Procedure 12(b)(6) provides that a complaint may be dismissed for
"failure to state a claim upon which relief can be granted."  In deciding a 12(b)(6) motion, all factual
allegations in the complaint are taken as true, and all reasonable inferences are drawn in the
plaintiff's favor.  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, 797 F.3d 160, 169 (2d Cir. 2015).
To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true,
to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)
(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff
pleads factual content that allows the court to draw the reasonable inference that the defendant is
liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  Although "detailed factual
allegations" are not required, a complaint must contain "more than labels and conclusions" or "a
formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555.  "[N]aked

assertion[s]," absent "further factual enhancement," are also inadequate to state a claim successfully. *Id.* at 557.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In reviewing the record to determine whether there is a genuine issue for trial, the court must construe the evidence in the light most favorable to the non-moving party." *Genova v. Cty. of Nassau*, No. 17-CV-4959 (SJF)(AYS), 2020 WL 813160, at *2 (E.D.N.Y. Feb. 19, 2020) (quotation and citation omitted).

## ANALYSIS

Section I of this Report and Recommendation considers Count I of the Amended Complaint, the *Bivens* actions against the Individual Defendants. In Section I(A), the undersigned analyzes Defendants' argument that Juste and Espinal's *Bivens* claims should be dismissed because they did not exhaust their administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA"). Section I(B), examines whether the facts Plaintiffs allege can form the basis of *Bivens* actions under the two-part test reaffirmed by the Supreme Court in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017). The undersigned considers Plaintiffs' claims for deficient medical care (Section I(B)(1)) separately from their claims for inhumane housing conditions, lack of fresh air and sunlight, and deficient food services ("Conditions of Confinement Claims") (Section I(B)(2)). Section I(C) analyzes Defendants' argument that even if Plaintiffs can bring *Bivens* actions, Defendants cannot be liable because they are entitled to qualified immunity. This Section considers whether qualified immunity should be evaluated at the motion to dismiss stage (Section I(C)(1)), whether Plaintiffs' deficient medical care claims rise to the level of an Eighth Amendment violation

(Section I(C)(2)(a)), and whether each Defendant was personally involved in the Constitutional violations (Section I(C)(2)(b)).  Finally, Section II explores whether sovereign immunity bars Plaintiffs' claim for injunctive relief against the Official Defendants, as set forth in Count II of the Amended Complaint.

## I.      *Bivens* Claims Against the Individual Defendants (Count I)

### A.      Exhaustion of Administrative Remedies

The PLRA states, "[n]o action shall be brought with respect to prison conditions under . . . any . . . Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).

Defendants claim that "Juste and Espinal were incarcerated at the time the Complaint was filed" and, as a result, they "were required to comply with the PLRA's exhaustion requirements prior to commencing this action."  (Motion at 14 (citing Am. Compl. ¶¶ 13, 15).)  However, because "Juste and Espinal do not allege that they" complied, or attempted to comply, with those requirements, "the Court should dismiss the *Bivens* claims [they] filed . . . against the Individual Defendants."  (*Id.* at 14-15.)  In their Opposition, Plaintiffs argue, first, that Juste and Espinal "are no longer subject to the exhaustion requirements" because "they [ ] filed an amended complaint after being released from custody."  (Opp. at 24 (emphasis omitted).)  Second, they argue that because "[i]n class actions, one class member exhausting his or her remedies has done so on behalf of the entire class," Crespo's fulfillment of his exhaustion requirement "applies vicariously to Plaintiffs Espinal and Juste."  (*Id.* at 25 (footnote omitted).)

A court in this Circuit recently addressed the issue of the PLRA's exhaustion requirement in the context of a motion to certify a class of inmates pursuant to Federal Rule of Civil Procedure 23(a).  In *Barfield v. Cook*, No. 3:18-CV-1198 (MPS), 2019 WL 3562021 (D. Conn. Aug. 6, 2019), the defendant argued, *inter alia*, that two of the named plaintiffs were not adequate class representatives

because they failed to exhaust their administrative remedies. *See id.* at *7. The district court rejected this argument, explaining "that the PLRA's exhaustion requirement is satisfied as long as at least one member of the proposed prisoner class has exhausted applicable remedies." *Id.* Because in *Barfield* at least two members of the putative class exhausted their remedies, "[f]ailure to exhaust d[id] not defeat claims by the putative class members at [that] stage of litigation." *Id.* at *8.

Here, Crespo exhausted his administrative remedies, a fact that Defendants do not contest. (*See* Motion at 13-15.) Accordingly, his exhaustion is sufficient for pleading purposes at the motion to dismiss stage for all members of the putative class.[4]

**B.    *Ziglar* Analysis**

Defendants argue that Plaintiffs' *Bivens* claims should be dismissed for two main reasons related to the Supreme Court's decision in *Ziglar*. First, they argue that Plaintiffs' claims do not arise in any recognized *Bivens* context. (Motion at 8-10.) Second, they argue that special factors counsel against expanding *Bivens* to Plaintiffs' claims. (*Id.* at 10-12.)

In *Bivens*, "the Supreme Court 'recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights.'" *Arar v. Ashcroft,* 585 F.3d 559, 571 (2d Cir. 2009) (quoting *Corr. Servs. Corp. v. Malesko,* 534 U.S. 61, 66

---

[4] Defendants also argue that Juste and Espinal were required to exhaust administrative remedies because they were in custody when the Complaint was filed. Because § 1997e(a) is limited to an action brought "by a prisoner confined in any jail, prison, or other correctional facility," "[t]he requirement of exhaustion of administrative remedies before filing suit applies only to individuals who were in custody at the time that they filed their lawsuit." *Ojo v. United States,* No. 15-CV-6089 (ARR)(LB), 2018 WL 3863441, at *7 (E.D.N.Y. Aug. 14, 2018). The Amended Complaint states that Juste was held at MDC Brooklyn until April 25, 2017, and Espinal was held there until September 26, 2017. (Am. Compl. ¶¶ 13, 15.) Because the Complaint was filed on October 31, 2017, they were no longer at MDC Brooklyn at the time they filed their lawsuit. (Dkt. 1.) However, Defendants submitted documentation, which Plaintiffs do not contest, showing that Juste and Espinal were not released on those dates, but transferred to other BOP facilities. (Declaration of Michael Cardew, Dkt. 47-3 ("Cardew Decl.") ¶¶ 15, 18; Plaintiffs' Response to Defendants' Statement of Undisputed Facts ¶¶ 3, 4, Dkt. 48.) Espinal was released on December 19, 2017, and Juste was released on May 25, 2018, both dates after the Complaint was filed. (Cardew Decl. ¶¶ 17, 20.) Because of the conclusion above with regard to vicarious exhaustion, the undersigned finds it unnecessary to determine whether Juste and Espinal were "in custody" when they were in a BOP facility other than MDC Brooklyn, such that exhaustion of administrative remedies was required.

(2001)).  Subsequent to *Bivens*—which involved a Fourth Amendment claim for unreasonable search and seizure, *see Bivens*, 403 U.S. at 393, 397—the Supreme Court recognized claims against federal officers for damages in two other circumstances: a gender discrimination claim under the Fifth Amendment's Due Process Clause, *Davis v. Passman*, 442 U.S. 228 (1979); and a cruel and unusual punishment claim against prison officials for failure to treat an inmate's asthma, which led to his death, under the Eighth Amendment, *Carlson v. Green*, 446 U.S. 14 (1980).  *See Hernandez v. Mesa*, 140 S. Ct. 735, 741 (2020); *see also Rivera v. Samilo*, 370 F. Supp. 3d 362, 366 (E.D.N.Y. 2019).

However, the Supreme Court has declined since to broaden *Bivens* further, explaining that doing so "is now a 'disfavored' judicial activity."  *Ziglar*, 137 S. Ct. at 1857 (quoting *Iqbal*, 556 U.S. at 675).  To guide courts as to when a plaintiff may maintain such a claim, the Supreme Court established "a rigorous two-step inquiry."  *Rivera*, 370 F. Supp. 3d at 367.

First, the undersigned must determine whether the case arises in a "new *Bivens* context." *Ziglar*, 137 S. Ct. at 1859.  A case arises in a new *Bivens* context if it differs "in a meaningful way" from other *Bivens* cases decided by the Supreme Court.  *Id.*  Although the Supreme Court declined "to create an exhaustive list of differences that are meaningful enough to make a given context a new one," *id.* at 1859-60, it offered the following "instructive" examples:

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860. Even though "the new-context inquiry is easily satisfied, the Supreme Court has recognized that some differences, of course, will be so trivial that they will not suffice to create a new *Bivens* context."  *Ramirez v. Tatum*, 17-CV-7801 (LGS), 2018 WL 6655600, at *5 (S.D.N.Y.

Dec. 19, 2018), *reconsideration denied*, 2019 WL 2250339 (S.D.N.Y. May 24, 2019) (quotation, citation, and alteration omitted).

If the case presents a new *Bivens* context, then the court must proceed to step two. Here, the court must consider whether "Congress has created any alternative, existing process protecting the injured party's interest," *Ziglar*, 137 S. Ct. at 1858 (quotation, citation, and alteration omitted), and, even if there is no such process, whether there are "special factors counselling hesitation in the absence of affirmative action by Congress." *Id.* at 1857 (quotations and citation omitted). The phrase "special factors counselling hesitation" has not been defined by the Supreme Court, but the "necessary inference" is that "the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1857-58. If such special factors exist, the court must "reject the request" to extend *Bivens*. *Mesa*, 140 S. Ct. at 743.

Here, Plaintiffs bring *Bivens* claims under the Eighth Amendment for (1) deficient medical care, (2) inhumane housing conditions, (3) lack of fresh air and sunlight, and (4) deficient food services.

1.    Deficient Medical Care Claims

The deficient medical care claims set forth by Crespo, Podias, Juste, Joseph, and Espinal closely mirror those in *Carlson* and, therefore, do not present a new *Bivens* context.

Plaintiffs and the respondent in *Carlson* allege that they were provided deficient medical care. (*See, e.g.*, Am. Compl. ¶¶ 67-68, 80, 86, 92-95, 101-02.) *See Carlson*, 446 U.S. at 16 n.1. As a result of these deficiencies, Plaintiffs and the *Carlson* respondent allege, their Eight Amendment rights were violated. (*See, e.g.*, Am. Compl. ¶¶ 35, 69, 81, 87, 96, 103.) *See Carlson*, 446 U.S. at 16; *see also Laurent v. Borecky,* 17-CV-3300 (PKC)(LB), 2018 WL 2973386, at *4-5 (E.D.N.Y. June 12, 2018) (finding that the plaintiff's claim for failure to provide medical care is not a new *Bivens* context, even though it arose under a different constitutional right). This case further resembles *Carlson* in that the alleged

misconduct is specific to each Plaintiff, and not policy-related. *See Ziglar*, 137 S. Ct. at 1860 (finding that the plaintiffs' challenge to an Executive branch detention policy "bear[s] little resemblance to the three *Bivens* claims the Court has approved in the past"). Defendants here also had the same "extent of judicial guidance" available to the petitioners-defendants in *Carlson* with regard to responding to the same problem: courts have "long made clear the standard for claims alleging failure to provide medical treatment to a prisoner—deliberate indifference to serious medical needs." *Laurent*, 2018 WL 2973386, at *5 (quotation and citation omitted).

Defendants argue that Plaintiffs' allegations regarding medical care are "conclusory" and "dissimilar" from the circumstances of *Carlson*, particularly because they are merely "quasi-medical" and not medical emergencies. (Motion at 9-10; Reply at 4.) The undersigned disagrees. Plaintiffs' allegations regarding medical care are specific enough to survive a motion to dismiss. Moreover, while the degree of medical care sought here is not identical to that in *Carlson*, it is sufficient to satisfy the first prong of *Ziglar*; the seriousness of Plaintiffs' medical conditions is considered in the context of whether the violation rises to a deprivation of an Eighth Amendment right for the purpose of qualified immunity. (*See* Section I(C)(2)(a) of this Report and Recommendation.)

Accordingly, the undersigned recommends finding that the *Bivens* claims for deficient medical care asserted by Crespo, Podias, Juste, Joseph, and Espinal do not arise under a new *Bivens* context.

2.     Conditions of Confinement Claims

a.     Plaintiffs' Claims Arise in a New *Bivens* Context

Plaintiffs contend that their "*Bivens* claims for inadequate living conditions and food represent a trivial departure from *Carlson* and therefore do not arise under a new context." (Opp. at 20.) It is a trivial departure because the Supreme Court established in *Farmer v. Brennan*, 511 U.S. 825

(1994), "that prison officials are obligated by the Eighth Amendment to provide adequate living conditions and food." (Opp. at 20 (citing *Farmer*, 511 U.S. at 832).)

The Supreme Court has explained that "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Mesa*, 140 S. Ct. at 743 (petitioners contended that "their Fourth and Fifth Amendment claims d[id] not involve a new context because *Bivens* and *Davis* involved claims under those same two amendments"); *see also Rivera*, 370 F. Supp. 3d at 368 (explaining that the mere fact that a plaintiff "asserts the same constitutional right as one of the three recognized cases . . . does not mean the case does not present a new context" (citing *Ziglar*, 137 S. Ct. at 1859)); *Gonzalez v. Hasty*, 269 F. Supp. 3d 45, 58 (E.D.N.Y. 2017), *aff'd*, 755 F. App'x 67 (2d Cir. 2018) ("As an initial matter, even though the Supreme Court has recognized causes of action in *Bivens* under the Fourth Amendment, in *Davis* under the Fifth Amendment, and in *Carlson* under the Eighth Amendment, that does not mean that any cause of action may lie under those Amendments simply by virtue of these Supreme Court cases.") "Instead of looking only to which constitutional amendment is cited, the Court must assess *Ziglar*'s non-exhaustive list of factors, including 'the constitutional *right* at issue.'" *Rivera*, 370 F. Supp. 3d at 369 (quoting *Ziglar*, 137 S. Ct. at 1859-60).

Here, Plaintiffs rely on *Farmer* for the proposition that they have a constitutional right to humane housing, fresh air and sunlight, and sufficient food services. (Opp. at 20.) While *Farmer* does describe the protections afforded prisoners by the Eighth Amendment as including "humane conditions of confinement," such as receiving "adequate food, clothing, shelter, and medical care," *Farmer*, 511 U.S. at 832-33, it does not go on to hold—or even discuss—whether those protections can form the basis of a *Bivens* claim. Instead, *Carlson* is the only case in which the Supreme Court held that the Eighth Amendment may form the basis of a *Bivens* claim, and the allegations there focused exclusively on the prison officials' failure to provide "competent medical attention."

*Carlson*, 446 U.S. at 16 n.1. While there is an understandable link between health and the conditions of confinement complained of here, *Carlson* did not extend to health conditions generally, only medical care. Plaintiffs argue that inhumane housing conditions, lack of fresh air and sunlight, and deficient food services are "similar" to the inadequate medical care presented in *Carlson*. (Opp. at 20.) However, the differences between the two types of allegations are not trivial. Housing conditions, access to fresh air and sunlight, and food quality may be based on the actions of officials of different ranks from those providing medical care. Those conditions also involve more general official actions than those involved in providing individualized medical care. In addition, the degree of judicial guidance provided with regard to medical care is different from that provided for generalized conditions such as proximity to particulate matter, frequency of access to outdoor space, and other conditions of the Cadres' living conditions. These non-trivial differences give rise to a new *Bivens* context. *See Gonzalez*, 269 F. Supp. 3d at 64 (holding that the plaintiff's "non-medical [Eighth Amendment] claims present facts that are very different from *Carlson*, such that it is a 'new context'").

### b. There Are Special Factors Counseling Hesitation

Because Plaintiffs' Conditions of Confinement Claims arise in a new *Bivens* context, it is necessary to proceed to the second step of the *Ziglar* analysis, where the court analyzes "whether there are any special factors counselling against a judicially-created damages remedy, including whether any alternative remedies exist[ ]." *Rivera*, 370 F. Supp. 3d at 369.

Defendants claim that "alternative remedies" exist in that Plaintiffs could have (1) "petitioned for *habeas* relief under 28 U.S.C. § 2241," (2) "moved for an injunction or other forms of equitable relief requiring the warden to bring his prison into compliance with BOP regulations," (3) "sued the United States under the Federal Tort Claims Act" ("FTCA"), (4) "brought state-law tort

claims," and (5) "[sought] recourse through the BOP's Administrative Remedy Program."  (Motion at 11 (citations and alteration omitted).)

Plaintiffs argue that these five alternative remedies do not satisfy *Ziglar*'s step two because they are "either non-existent," in the case of the FTCA and state tort law claims, "or plainly inadequate," in the case of *habeas*, injunctive relief, and the BOP's administrative program.  (Opp. at 21-23.)  Even if Plaintiffs are correct that the FTCA and state tort law claims are insufficient,[5] they are incorrect as to *habeas* relief, injunctive relief, and the BOP's program.  "An alternative remedy need not be 'perfectly congruent' with *Bivens*" for it to be sufficient under *Ziglar*. *Rivera*, 370 F. Supp. 3d at 371 (citing *Minneci*, 565 U.S. at 129).  *Habeas* relief, injunctive relief, and the BOP's program satisfy this requirement.  *See Malesko*, 534 U.S. at 74 (finding that a *Bivens* remedy was inappropriate where the prisoner had "full access to remedial mechanisms established by the BOP, including suits in federal court for injunctive relief and grievances filed through the BOP's Administrative Remedy Program"); *Ojo v. United States*, 364 F. Supp. 3d 163, 174 (E.D.N.Y. 2019) (concluding that "there were alternative channels that plaintiff could have pursued," including "injunctive or declaratory relief" and a writ of *habeas corpus*); *Sanford v. Bruno*, No. 17-CV-5132 (BMC), 2018 WL 2198759, at *6 (E.D.N.Y. May 14, 2018) (holding that alternative remedies for the plaintiff prisoner's "[d]eprivations of constitutional rights" included "*habeas corpus* relief" and the BOP's administrative process mandated by the PLRA (citations omitted)); *Gonzalez*, 269 F. Supp. 3d at 60 (finding that the plaintiff prisoner had adequate alternative remedies in the form of "administrative complaints" and "the filing of a writ of habeas corpus").

---

[5] *See Minneci v. Pollard*, 565 U.S. 118, 126 (2012) ("Prisoners ordinarily *cannot* bring state-law tort actions against employees of the Federal Government." (emphasis in original)); *Carlson*, 446 U.S. at 23 ("Plainly FTCA is not a sufficient protector of the citizens' constitutional rights, and without a clear congressional mandate we cannot hold that Congress relegated respondent exclusively to the FTCA remedy.").

Even if Plaintiffs are correct and the alternative remedies suggested by Defendants are inadequate, the undersigned finds that there are additional special factors which counsel against recognizing a new type of *Bivens* claim here.

First, Congress had "specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs" when it enacted the PLRA fifteen years after the Supreme Court decided *Carlson*. *Ziglar*, 137 S. Ct. at 1865. This "legislative action suggest[s] that Congress does not want a damages remedy" for other types of prisoner mistreatment and "is itself a factor counseling hesitation." *Id.*; *see also Abdoulaye v. Cimaglia*, No. 15-CV-4921 (PKC), 2018 WL 1890488, at *7 (S.D.N.Y. Mar. 30, 2018) ("The PLRA does not provide for a standalone damages remedy, suggesting that Congress chose not to extend the *Carlson* remedy to cases involving other types of prisoner mistreatment." (quotations and citation omitted)); *Gonzalez*, 269 F. Supp. 3d at 61 (citing *Ziglar* and the legislative history of the PLRA and finding that "there is very good support for the conclusion that Congress does not want a *Bivens* remedy in this context").

Second, a *Bivens* action "ha[s] never been considered a proper vehicle for altering an entity's policy." *Malesko*, 534 U.S. at 74. Rather, "a *Bivens* claim is brought against the individual official for his or her own acts, not the acts of others." *Ziglar*, 137 S. Ct. at 1860. Here, Plaintiffs' Conditions of Confinement Claims are largely premised on allegations about MDC Brooklyn's general policies and practices as they relate to food, access to sunlight and the outdoors, and the manner in which the Cadres are housed. (*See* Am. Compl. ¶¶ 31-60.) Adjudication of these claims "would . . . interfere in an intrusive way with sensitive functions of the Executive Branch" because "inquiry and discovery into the whole course of the discussions and deliberations that led to the policies" would be necessary. *Ziglar*, 137 S. Ct. at 1860-61. This "factor alone, the *Ziglar* Court urges, should counsel hesitation, encouraging courts to stay their hands rather than interfere in a sensitive area better reserved for congressional decision-making." *Ojo*, 364 F. Supp. 3d at 175.

Accordingly, the undersigned respectfully recommends that the Motion be granted as to Plaintiffs' Conditions of Confinement Claims.

### C.    Qualified Immunity

Defendants argue that "[w]hether or not *Bivens* may be extended to Plaintiffs' claims and the Court excuses the failure of Juste and Espinal to exhaust their administrative remedies, the Court should dismiss Plaintiffs' Eighth Amendment claims" because the Individual Defendants are "shield[ed]" by qualified immunity.  (Motion at 15.)  In addition to contending that qualified immunity does not apply here (Opp. at 7-16), Plaintiffs also claim that the issue of whether Defendants are entitled to qualified immunity should be decided on a motion for summary judgment, not a motion to dismiss.  (*Id.* at 6-7.)  The undersigned turns to this threshold issue first.

### 1.    Qualified Immunity May be Considered During a Motion to Dismiss

Plaintiffs argue that "[q]ualified immunity is an affirmative defense and a plaintiff need not plead facts showing the absence of such a defense.  Because the defense raises questions of fact, it is a defense that often can and should be decided on a motion for summary judgment."  (*Id.* at 6 (quotations and citations omitted).)

 "[B]ecause 'the entitlement [of qualified immunity] is an *immunity from suit* rather than a mere defense to liability,'" the Supreme Court "repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation."  *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (per curiam) (alteration omitted) (emphasis in original).  A blanket rule that courts should resolve qualified immunity at the summary judgment stage, as Plaintiffs advocate, is particularly inappropriate given "that the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotations, citation, and alteration omitted).

Although qualified immunity claims are to be resolved as early as possible, the Second

Circuit has cautioned that "*usually*, the defense of qualified immunity cannot support the grant of a

Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted." *McKenna v.*

*Wright*, 386 F.3d 432, 435 (2d Cir. 2004) (quotation, citation, and alterations omitted) (emphasis in

original). "[T]he defense faces a formidable hurdle when advanced on" a motion to dismiss. *Id.* at

434. However, "a district court may grant a Rule 12(b)(6) motion on the ground of qualified

immunity if the facts supporting the defense appear on the face of the complaint." *Moore v. Newton*,

220 F. Supp. 3d 275, 285 (E.D.N.Y. 2016) (quotation and citation omitted). In evaluating such a

motion, the plaintiff must be afforded "all reasonable inferences from the facts alleged, not only

those that support his claim, but also those that defeat the immunity defense." *McKenna*, 386 F.3d at

436.

Given the Supreme Court's preference for resolving qualified immunity issues "at the earliest

possible stage in litigation," *Hunter,* 502 U.S. at 227, the undersigned does not consider it premature

to consider Defendants' qualified immunity defense.

2.    <u>Whether the Individuals Defendants are Protected by Qualified Immunity</u>

Qualified immunity protects government officials from liability for civil damages "unless a

plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2)

that the right was 'clearly established' at the time of the challenged conduct." *Wood v. Moss*, 572 U.S.

744, 757-58 (2014) (quotation and citation omitted). "Requiring the alleged violation of law to be

clearly established balances the need to hold public officials accountable when they exercise power

irresponsibly and the need to shield officials from harassment, distraction, and liability when they

perform their duties reasonably." *Id.* (quotations, citation, and alteration omitted). To determine

whether a right was clearly established, "a court must ask whether it would have been clear to a

reasonable officer that the alleged conduct 'was unlawful in the situation he confronted.'" *Ziglar*,

137 S. Ct. at 1867 (quoting *Saucier v. Katz*, 553 U.S. 194, 202 (2001)).  In the context of a *Bivens* suit, "vicarious liability is inapplicable."  *Iqbal*, 556 U.S. at 676.  Therefore, to establish that an official violated a clearly established right, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Id.*; *see Ojo*, 2018 WL 3863441, at *9.

With regard to the first step of the analysis, Defendants argue that their actions as alleged by Plaintiffs do not violate the Eighth Amendment with respect to the Conditions of Confinement Claims because they "are a far cry from the wanton and unnecessary infliction of pain against which the Eighth Amendment protects."  (Motion at 16.)  Defendants further argue that the claims of deficient medical care "are not objectively serious enough to raise an Eighth Amendment violation." (*Id.* at 23.)

As to the second step of the analysis, Defendants argue that Plaintiffs "failed to plead facts sufficient to establish that any of the Individual Defendants . . . personally violated the constitutional rights of each of the Plaintiffs."  (*Id.* at 18; *see also id.* at 22-23.)  Thus, they contend, Plaintiffs fail to establish that any violation that did occur was of a clearly established right.  (*Id.* at 15.)

Because the undersigned recommends that Plaintiffs' Conditions of Confinement Claims be dismissed based on the *Ziglar* analysis, the qualified immunity analysis is limited to the deficient medical care claims.

a.  <u>Step One: Whether Plaintiffs Alleged Eighth Amendment Violations</u>

Defendants argue that Plaintiffs' deficient medical care claims do not rise to the level of Eighth Amendment violations because their "'conclusory' allegations regarding inconsistent medical care are 'not objectively serious enough to raise an Eighth Amendment violation,' let alone a clearly established Eighth Amendment violation."  (Motion at 23.)

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834 (quotations and citations omitted). Second, "a prison official must have a sufficiently culpable state of mind. In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety . . . ." *Id.* (quotations and citations omitted).

In other words, an Eighth Amendment claim has an objective and a subjective component. *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006). The objective component determines (a) whether a person "was actually deprived of adequate medical care" and, if so, (b) whether "the inadequacy in medical care [was] sufficiently serious." *Id.* The seriousness inquiry depends in part on the type of unreasonable medical care alleged:

> [I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.

*Id.* at 280. "In most cases, the actual medical consequences that flow from the denial of care are highly relevant in determining whether the denial of treatment subjected the detainee to a significant risk of serious harm." *Charles v. Orange Cty.*, 925 F.3d 73, 86 (2d Cir. 2019). Determining whether this element has been satisfied "may be ill-suited for resolution at the pleading stage and will have to await summary judgment proceedings, at which point a fully developed medical record will inform the court as to the nature of the plaintiff's condition." *Campbell v. New York City*, 12-CV-2179

(CBA)(VMS), 2014 WL 4199717, at *4 (E.D.N.Y. May 7, 2014), *R&R adopted*, 2014 WL 4199722 (E.D.N.Y. Aug. 22, 2014) (quotations omitted).

The subjective component determines whether "the charged official [ ] act[ed] with a sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 280. For this component, "it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Id.* (citation omitted). The prison official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see also Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) ("Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness—an act or a failure to act by a prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (quotation, citation, and alteration omitted)). However, "questions . . . such as . . . '[w]hat was the [d]efendants' mental state'" may not be "ripe for adjudication on the basis of [a] complaint and its appended materials," and, instead, "may become clear[ ] at summary judgment or at some later stage in [ ] litigation." *Jones v. Westchester Cty. Dep't of Corr. Med. Dep't*, 557 F. Supp. 2d 408, 416 (S.D.N.Y. 2008) (quotation and citation omitted).

The undersigned analyzes each Plaintiff's deficient medical care claim separately to determine whether the claim satisfies the Eighth Amendment.[6]

### i. Crespo

*Objective Component.* Crespo is diabetic. (Am. Compl. ¶ 63.) He alleges two incidents in which he was given deficient medical care. First, in June 2015, Corrections Officer Mackler "threatened [Crespo] with punishment and forced him to go to" solitary confinement for three days.

---

[6] Espada's claims do not indicate that he sought any medical treatment and, thus, his allegations do not raise a medical claim. (*See* Section I(B) of this Report and Recommendation.)

(*Id.* ¶ 67.)  At some point during the three days, an MDC Brooklyn nurse checked Crespo's blood sugar and found that it "was high." (*Id.*)  On the second day of his confinement, the same nurse "put a 'Do Not Feed' sign on" Crespo's door.  (*Id.*)  During his confinement, Crespo was not given "food or necessary medications," and, as a result, "he experienced lethargy, dizziness, confusion and diabetic tremors." (*Id.*)  Second, in May 2016, Crespo "contracted an unknown infection, with symptoms of skin rashes, body aches, painful swelling and dizziness." (*Id.* ¶ 68.)  Crespo alleges that "[d]espite multiple requests to be seen by MDC Brooklyn medical personnel over a period of a week, [he] was ignored by [those] personnel and ultimately fainted." (*Id.*)  "Eventually," Crespo was taken to a hospital where he was given "a seven-day course of antibiotics for an unknown infection." (*Id.*)  Crespo's treating physician informed him "that his infection was potentially caused by and likely to reoccur under the living conditions of MDC Brooklyn." (*Id.*)  Indeed, Crespo's symptoms have "continue[d] to reoccur." (*Id.*)

Because the undersigned cannot determine at this time the "actual medical consequences that flow from the alleged denial of care," *Davis v. McCready*, 283 F. Supp. 3d 108, 120 (S.D.N.Y. 2017) (quotation and citation omitted), especially those related to the June 2015 incident, the undersigned concludes that dismissal on this objective component of the Eighth Amendment analysis is inappropriate. *See Edmonds v. Cent. N.Y. Psychiatric Ctr.*, No. 10-CV-5810 (DAB)(KNF), 2011 WL 3809913, at *5 (S.D.N.Y. Aug. 25, 2011) ("[W]ithout a developed record, the [c]ourt is not in a position to decide whether Plaintiff's test results did not present a risk such that Plaintiff's diabetes constituted a serious medical need." (footnote omitted)).

*Subjective Component.*  Plaintiffs do not allege that Individual Defendants Ask-Carlson, Travers, or Decker knew of either the June 2015 incident or the May 2016 incident.  Instead, those individual Defendants' alleged knowledge comes solely from the "main line" meetings, "media coverage," the Federal Defenders, "multiple reports" by the NAWJ's Women in Prison Committee, and by virtue

of their positions of authority.  (Am. Compl. ¶¶ 5, 31-34; *see also* Opp. at 14-16.)  These allegations

are insufficient to establish an Eighth Amendment violation, as Plaintiffs "do[ ] not plausibly allege

that" Ask-Carlson, Travers, or Decker "were aware of, and disregarded, the challenged conditions."

*Estevez v. City of New York*, No. 16-CV-00073 (JGK), 2017 WL 1167379, at *4 (S.D.N.Y. Mar. 28,

2017); *see also Seymore v. Dep't of Corr. Servs.*, No. 11-CV-2254 (JGK), 2014 WL 641428, at *4 (S.D.N.Y.

Feb. 18, 2014) ("The allegations are insufficient to allege plausibly that any individual defendant

acted with a sufficiently culpable state of mind because the plaintiff has, at most, alleged that various

defendants were negligent in failing to correct conditions, not that any defendant obdurately and

wantonly refused to remedy a specific risk to the plaintiff.").[7]

Plaintiffs further allege that Individual Defendants Quay and Carvajal had knowledge of

Crespo's deficient medical care because they received, and rejected, administrative appeals from

Crespo.[8]  On May 5, 2017, Crespo appealed the denial of his "Inmate Request For Informal

Resolution" to Quay by filing a "Request for Administrative Remedy" form with Quay's office.

(Am. Compl. ¶ 105.)  Quay "summarily rejected" the Request for Administrative Remedy on May 9,

2017.  (*Id.*)  Crespo then appealed this denial to Carvajal on May 23, 2017.  (*Id.* ¶ 106.)  Carvajal

denied the appeal eight days later.  (*Id.*)  Drawing all reasonable inferences in favor of the Plaintiffs,

Crespo alleges that he set forth on the two grievance forms that corrections officers "routinely deny

Cadre access to necessary medical care," that "[e]ven when permitted by corrections officers to seek

---

[7] Moreover, Plaintiffs' allegations take the NAWJ report completely out of context.  The NAWJ report
exclusively detailed the "unconscionable" "conditions for women at MDC [Brooklyn]."  National Association
of Women Judges (NAWJ) Women in Prison Committee (WIP) Second Visit to BOP's Metropolitan
Detention Center (MDC), Brooklyn, New York, June 3, 2016 at 3,
https://www.nawj.org/uploads/files/monthly_update/referenced_docs/july_2016/bop_nawj_june_3_2016
_visit_metropolitan_detention_center_ny.pdf.  The report does not make any conclusions about the
conditions of the male inmates, such as Plaintiffs, nor does it purport to do so.

[8] Although both Quay and Carvajal are alleged to have knowledge of Crespo's deficient medical care through
the media, the NAWJ report, and by virtue of their positions (*see* Am. Compl. ¶¶ 5, 31, 33, 34), only Quay is
alleged to have attended the Main Line meetings.  (*Id.* ¶ 32.)  Carvajal is not alleged to have been at any of
these sessions.  (*Id.*)

medical care, the care itself is unconstitutionally deficient," and the details of the June 2015 incident. (*Id.* ¶¶ 36-37, 67, 104-06, 138-42.)  Crespo does not allege that he included the May 2016 incident in either notice.

Crespo's allegations about Quay and Carvajal's knowledge of the deficient medical care he received are not sufficient to establish that the two Defendants were deliberately indifferent towards his medical needs.  "A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official exhibited deliberate indifference by failing to act on information indicating that the violation was occurring."  *Rivera v. Bloomberg*, No. 11-CV-629 (PGG), 11-CV-4325 (PGG), 2012 WL 3655830, at *6 (S.D.N.Y. Aug. 27, 2012) (quotation, citation, and alteration omitted).  The fact that Quay and Carvajal are alleged to have known about the deficient medical care at MDC Brooklyn generally in addition to the allegations in the appeal forms specifically does not alter that conclusion.  *See Clay v. Lee*, No. 13-CV-7662 (KMK), 2017 WL 436041, at *6 (S.D.N.Y. Jan. 30, 2017) ("While Plaintiff claims that his filing of a grievance and the [Special Treatment Program] walk-throughs necessarily gave Defendants knowledge of the conditions to which they were indifferent, this alone does not equate to deliberate indifference." (footnote omitted)).[9]

ii. Podias

*Objective Component.*  Podias alleges that he "received a serious cut to [his] hand on jagged metal" because "he was not provided with gloves" when he performed his MDC Brooklyn-assigned work detail, even though the fact that Podias had "requested gloves" in the past.  (Am. Compl. ¶ 80.)  "Despite multiple requests for medical assistance and substantial bleeding, Mr. Podias went untreated for over an hour, during which time he fainted from blood loss."  (*Id.*)

---

[9] Crespo includes allegations that Corrections Officer Mackler and Nurse Brooks knew of and possibly contributed to the June 2015 medical incident.  (*See* Am. Compl. ¶ 67.)  However, these allegations do not alter the subjective component analysis, as Mackler and Brooks are not defendants.

Podias has failed to plead an objectively serious injury.  "Courts in this Circuit have consistently held that cuts, lacerations, bruises, and other superficial injuries . . . are not sufficiently serious to support a deliberate indifference claim."  *Goodwin v. Kennedy*, No. 13-CV-1774 (SJF)(AKT), 2015 WL 1040663, at *12 (E.D.N.Y. Mar. 10, 2015) (quotation and citation omitted) (collecting cases) (finding that the plaintiff did not satisfy the objective component when he pleaded that he had "multiple cuts, lacerations, abrasions, and contusions" and "injured fingers"); *see also Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) ("A bleeding finger does not pose a substantial risk of serious harm.").  "Moreover, Plaintiff has not presented evidence to show that his injured [hand] constituted a condition of urgency of the type that may produce death, degeneration or extreme pain which correspondingly merits constitutional protection."  *Goodwin*, 2015 WL 1040663, at *13 (quotation and citation omitted).

*Subjective Component*.  Plaintiffs do not allege that the Individual Defendants specifically knew about Podias's cut and subsequent bleeding and fainting.  Instead, they allege that the Individual Defendants were aware of the deficient medical care at MDC Brooklyn generally.  (Am. Compl. ¶¶ 5, 31-34; *see also* Opp. at 14-16.)  As discussed above, this is insufficient to establish the subjective component of the Eighth Amendment analysis.

### iii. Juste

*Objective Component*.  "Juste began regularly bleeding from his anus" in early 2016.  (Am. Compl. ¶ 86.)  Although he made "repeated medical requests," Juste was only seen by MDC Brooklyn medical personnel two times over the course of several months.  (*Id.*)  At no point during his incarceration at MDC Brooklyn did Juste receive a diagnosis.  It was only when he was transferred to a different prison that his bleeding "was almost immediately diagnosed and treated as hemorrhoids."  (*Id.*)

In *Muhammad v. New York Department of Corrections*, No. 10-CV-1707 (RJS)(RLE), 2011 WL 797506 (S.D.N.Y. Feb. 3, 2011), *R&R adopted*, 2011 WL 797672 (S.D.N.Y. Mar. 3, 2011), the plaintiff alleged that he had hemorrhoids, which "caused him to experience unbearable and excruciating pain, left him chronically weakened, and [ ] interfered with daily activities by making it practically impossible for him to use the bathroom." *Id.* at *3 (quotations and alteration omitted). The defendants moved to dismiss, arguing that the plaintiff's alleged medical infirmity was insufficiently severed. The court acknowledged that although many cases concluded that hemorrhoids were not a sufficiently serious medical condition, those courts did so at the "summary judgment stage, following full discovery." *Id.*[10] Accordingly, the court denied the motion, holding that "[a]t this this early stage of the proceedings," the plaintiff made "allegations sufficient to allow the [c]ourt to make the plausible inference that his condition was sufficiently serious to constitute a serious medical need, and that he received inadequate medical care to treat his condition." *Id.*

Here, Juste alleged that he had hemorrhoids, which went undiagnosed at MDC Brooklyn, that he regularly bled from his anus as a result, and that the condition continued for approximately a year. (*See* Am. Compl. ¶¶ 13, 86.) Unlike in *Muhammad*, Juste does not allege that the hemorrhoids caused him physical discomfort or that they interfered with daily activities. Therefore, the undersigned concludes that these allegations are insufficient to establish the objective component on a motion to dismiss. *Cf. Mims v. Ufland*, No. 7-CV-1926 (DLC), 2007 WL 4208582, at *3 (S.D.N.Y. Nov. 21, 2007) (finding that the plaintiff's allegations, which included that of "several serious injuries, including a stab wound to his right shin" were "sufficient at [the motion to dismiss] stage to

---

[10] *See, e.g., Youngblood v. Glasser*, No. 10-CV-1430 (NAM) (DEP), 2012 WL 4051846, at *8 (N.D.N.Y. Aug. 22, 2012), *R&R adopted*, 2012 WL 4051890 (N.D.N.Y. Sep. 13, 2012) (granting the defendants' summary judgment motion because, *inter alia*, the plaintiff did not establish that his "complain[ts] of hemorrhoids over a period of only a few days, during which he claims to have experienced rectal bleeding . . . [were] sufficient to establish an Eighth Amendment claim"); *Kendall v. Kittles*, No. 03-CV-628 (GEL), 2004 WL 1752818 , at *6 (S.D.N.Y. Aug. 4, 2004) ("The record similarly does not support a finding [on a motion for summary judgment] of a Constitutional violation with regard to [plainitff's] hemorrhoid condition.").

allow [the plaintiff] to present evidence of the seriousness of the alleged deprivation of medical care").

*Subjective Component*. Juste "fails to state any direct or personal involvement in his [medical] treatment" by any of the Individual Defendants. *Muhammad*, 2011 WL 797506, at *4. Instead, Juste relies on generic allegations that he was seen by "MDC Brooklyn medical personnel." (Am. Compl. ¶ 86.) Juste does not allege that he ever complained to the Individual Defendants or that the Individual Defendants were "otherwise made aware of [Juste's] condition." *Muhammad*, 2011 WL 797506, at *4. Accordingly, the Amended Complaint fails to allege that the Individual Defendants were deliberately indifferent to Juste's medical needs. *Id.*

### iv. Joseph

*Objective Component*. Joseph suffered a transient ischemic attack or a "mini-stroke," before being incarcerated. (Am. Compl. ¶ 92.) Upon his incarceration at MDC Brooklyn, he "informed an unknown MDC Brooklyn physician that he was still undergoing follow-up treatment . . . for his mini-stroke." (*Id.*) The physician told Joseph "that his scheduled neurological treatment was not important and that he would be unable to keep his appointments." (*Id.*) After he began bleeding from his ears, Joseph made "repeated requests for medical attention," which "were ignored for several weeks." (*Id.* ¶ 93.) Ultimately, Joseph received two medical appointments. (*Id.*) During the first one, a "MDC Brooklyn physician merely took [his] vitals and sent him back to his unit." (*Id.*) During the second appointment, Joseph was "released without treatment by an MDC Brooklyn physician." (*Id.*) Between the two appointments, Joseph felt "dizzy." (*Id.*)

"In September 2016, Mr. Joseph fainted but was ignored by MDC Brooklyn personnel and did not receive medical attention." (*Id.* ¶ 94.) The following month, he "fainted again" and was taken to a hospital, where he stayed for ten days. (*Id.*) "Upon his release [from the hospital], Mr. Joseph still suffered from dizziness and other symptoms." (*Id.*) Joseph also alleges that he "has

been diagnosed as a diabetic with high blood pressure," but the food he was given was "inappropriate for his condition, exacerbating his symptoms." (*Id.* ¶ 95.) He "suffered from nausea and diarrhea for months," but his "requests for medical attention were ignored by MDC Brooklyn corrections officers and medical personnel." (*Id.*)

The Amended Complaint alleges facts that could be construed to constitute a serious medical need. Joseph's allegations about his medical history (including his mini-stroke, diabetes, and high blood pressure), MDC Brooklyn's repeated denial of his requests for medical care (including the cessation of treatment for Joseph's mini-stroke that began before his imprisonment), and the symptoms he experienced while in prison (including fainting and dizziness) are sufficient to establish the objective component of the Eighth Amendment on a motion to dismiss. *See Maldonado v. Mandalaywala*, No. 17-CV-1303 (BKS/TWD), 2018 WL 2411806, at *2 (N.D.N.Y. May 29, 2018) ("The [c]ourt assumes, for purposes of this Decision and Order only, that plaintiff's post-stroke condition was, objectively speaking 'sufficiently serious' to support this claim.").

*Subjective Component.* Joseph's allegations suffer from the same infirmities as those of the other Plaintiffs: he fails to allege that any of the Individual Defendants was involved with or otherwise knew of his denial of medical care. To the extent he discusses any MDC Brooklyn employees, they are unnamed "corrections officers" and "medical personnel." As discussed above, these allegations are insufficient.

<u>v. Espinal</u>

*Objective Component.* Espinal had an ingrown toenail and a staphylococcus aurous[11] infection for which he was never provided the antibiotics prescribed to him twice. (Am. Compl. ¶ 101.) MDC Brooklyn Nurse Practitioner Gina Duncan referred "Espinal for outside podiatry care but Mr.

---

[11] The Amended Complaint refers to a staphylococcus "aurous" infection. (Am. Compl. ¶ 101.) The undersigned assumes that this is a misspelling of "aureus." *See, e.g.*, "General Information about *Staphylococcus aureus*," https://www.cdc.gov/hai/organisms/staph.html.

Espinal waited over a month before MDC Brooklyn scheduled the appointment, during which time [he] was in severe pain." (*Id.*) Duncan also ordered that "Espinal be given work convalescence" between February 14, 2017 and March 1, 2017 "and that he not be assigned work that required him to wear 'safety shoes' until August 13, 2017." (*Id.* ¶ 102.) "Despite this medical instruction, Mr. Espinal was forced, under threat of being sent to the punitive Special Housing Unit, by MDC Brooklyn corrections officers to work as an orderly in a position which required him to wear safety shoes, compounding his medical condition and causing him substantial pain." (*Id.*)

In other cases in this Circuit, district courts have found that a staphylococcus aureus infection may satisfy the objective component of the Eighth Amendment test. For example, in *Gaines v. Armor Health Care, Inc.*, No. 12-CV-5663 (JS)(WDW), 2013 WL 6410311 (E.D.N.Y. Dec. 9, 2013), the plaintiff alleged that he contracted a type of staphylococcus aureus infection in his left foot while housed in a Nassau County jail. *See id.* at *1. Despite informing the jail's medical staff about the condition, he did not receive treatment until three days later, at which point "he was in severe pain and could barely walk." *Id.* (citation omitted). While the court dismissed the claim because it found that the plaintiff failed to satisfy the subjective component, it stated that the staphylococcus aureus infection "could be a sufficiently serious condition." *Id.* at *5. In *McNulty v. Yaneka*, No. 11-CV-08320 (ER), 2013 WL 684448 (S.D.N.Y. Feb. 25, 2013), the plaintiff contracted a staphylococcus aureus infection. *Id.* at *2. Although he was "prescribed oral antibiotics, he developed a high fever, experienced increased pain and ultimately had to undergo surgery to remove the infection." *Id.* at *6. "[A]ccepting all factual allegations as true and drawing all reasonable inference in [the plaintiff's] favor, the [c]ourt [found] that the alleged deprivation in treatment subjected [the plaintiff] to "a significant risk of serious harm." *Id.*[12]

---

[12] The undersigned notes that the particular type of staphylococcus aureus infection in both *Gaines* and *McNulty* was the same, methicillin-resistant staphylococcus aureus or MRSA. *Gaines*, 2013 WL 6410311, at *1;

Here, Espinal waited longer than the plaintiff in *Gaines* for medical treatment.  He never received his twice-prescribed antibiotic medication.  Furthermore, the corrections officers did not follow the nurse's instructions that Joseph be given a set amount of time to heal and that he not be assigned to prison work that required the wearing of "safety shoes."  Under these circumstances, the undersigned finds that the Amended Complaint alleges facts that could be construed as satisfying the objective component.

*Subjective Component.*  Espinal fails to satisfy this part of the Eighth Amendment analysis for the same reasons as the other Plaintiffs.  He fails to allege that the Individual Defendants were involved with or otherwise aware of his deficient medical care.

\*        \*        \*

In sum, the undersigned finds that Crespo, Joseph, and Espinal have pleaded medically deficient care that is objectively serious.  However, the undersigned concludes that Plaintiffs did not establish that the Individual Defendants were deliberately indifferent to their health and safety.  As such, Plaintiffs have not pleaded Eighth Amendment violations and the Individual Defendants are entitled to qualified immunity.

b.  Step Two: Whether the Rights Violated Were Clearly Established

"Because personal involvement by a federal official is a prerequisite to liability under *Bivens*, federal officials who are not personally involved in an alleged constitutional deprivation may not be held vicariously liable under *Bivens* for the acts of subordinates."  *Perez v. Hawk*, 302 F. Supp. 2d 9, 18-19 (E.D.N.Y. 2004).  In *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995), the Second Circuit

---

*McNulty*, 2013 WL 68448 at \*2.  It is unclear from the pleadings whether Espinal had the same type of infection.

established five ways in which a plaintiff may demonstrate that a supervisory defendant was

personally involved in the alleged constitutional violation:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 873.

The Supreme Court expounded upon the limits of supervisory *Bivens* liability in *Iqbal*. There, the Supreme Court rejected the plaintiff's argument that the supervisor "can be liable for knowledge and acquiescence in" the unconstitutional conduct of their subordinates. *Iqbal*, 556 U.S. at 677 (quotation and citation omitted). Instead, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* As such, "purpose rather than knowledge is required to impose *Bivens* liability on . . . an official charged with violations arising from his or her superintendent responsibilities." *Id.*

In the wake of *Iqbal*—and in the absence of guidance from the Second Circuit—district courts in this Circuit have questioned the continuing viability of the *Colon* test for supervisory liability. *See Hill v. Laird*, No. 06-CV-0126 (JS)(ARL), 2016 WL 3248332, at *5 (E.D.N.Y. June 13, 2016) (stating that "[t]he Second Circuit has not yet determined *Iqbal*'s impact on non-discrimination claims"). The "district courts have effectively fallen into 'two camps,' with some courts holding that *Iqbal* eradicated the second, fourth, and fifth *Colon* factors and other courts holding that 'the viability of the second, fourth, and fifth *Colon* factors depends on the underlying constitutional claim.'" *Id.* (quoting *Marom v. City of N.Y.*, No. 15-CV-2017 (PKC), 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016)).

The undersigned finds it unnecessary to weigh into this debate for two reasons. First, Plaintiffs argue that after *Iqbal* the correct standard for assessing whether a supervisory defendant is liable for Eighth Amendment violations is still deliberate indifference. (*See* Opp. at 13 ("Defendants never adequately explain how to apply the proposed standard here nor how to reconcile it with the fact that [the] Second Circuit has sided with four other Circuits in holding that '*Iqbal* does not preclude *Bivens* claims premised on deliberate indifference when'—as is the case with Eighth Amendment claims—'the underlying constitutional violation requires no more than deliberate indifference.'" (quoting *Turkmen v. Hasty*, 789 F.3d 218, 250 (2d Cir. 2015) (footnote omitted))).) However, as explained above, Plaintiffs fail to demonstrate that any of the Individual Defendants were deliberately indifferent to the Plaintiffs' deficient medical care. Accordingly, Plaintiffs have not shown that the rights that were allegedly violated were clearly established. *Cf. Silva v. Kilham*, No. 3:19-CV-1719 (VLB), 2020 WL 2404922, at *6 (D. Conn. May 12, 2020) ("As previously discussed, the Court has concluded that Plaintiff has alleged plausible Eighth Amendment deliberate indifference claims . . . . Because the Eighth Amendment clearly proscribes deliberate indifference to the serious medical needs of prisoners . . . , the Court must deny Defendants' motion to dismiss on the basis of qualified immunity.").

Second, the Individual Defendants are protected by qualified immunity because of the uncertainty in the law of supervisory liability post-*Iqbal*. Qualified immunity is abrogated only when government officials "violate clearly established statutory or constitutional rights." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). However, here, the law of supervisory liability for *Bivens* actions based on Eighth Amendment violations is not clearly established. As another court in this district recently explained:

> There is room for ample debate as to whether, after *Iqbal*, the defendants' failure to respond to [the plaintiff's] complaints about inadequate [medical] care constituted sufficient personal involvement to be subject to *Bivens* liability. The Court of Appeals has not yet definitively decided which of the *Colon* factors remains a basis for

establishing supervisory liability in the wake of *Iqbal*, and no clear consensus has emerged among the district courts within the circuit.

*Ojo*, 2018 WL 3863441, at \*10 (quotation and citation omitted).  Given "the very uncertainty of the governing law," the court concluded that "the defendants [were] entitled to qualified immunity."  *Id.* (quotation and citation omitted).

Accordingly, the undersigned respectfully recommends that the Motion be granted as to Plaintiffs' deficient medical care claims.

*      *      *

Based on the findings above, the undersigned respectfully recommends that the Motion be granted as to Count I, and that Count I be dismissed.

## II.    Request for Injunctive Relief Against the Official Defendants (Count II)

Crespo, on behalf of himself and the "Injunctive Relief Class" (Am Compl. ¶ 147), seeks an injunction against the Official Defendants, compelling them to correct the deficient conditions alleged in the Amended Complaint and to provide "adequate medical care, living conditions and food for all current and future Cadre at MDC Brooklyn."  (*Id.* at 43.)

The Official Defendants maintain that "Plaintiffs have failed to articulate in their Amended Complaint any express waiver of sovereign immunity with respect to" their request for an injunction.  (Motion at 5.)

### A.    Sovereign Immunity

"The United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *Dotson v. Griesa*, 398 F.3d 156, 177 (2d Cir. 2005) (quotations, citation, and alteration omitted).  "The shield of sovereign immunity protects not only the United States but also its agencies and officers when the latter act in their official capacities."  *Id.*  "The Supreme Court has, however, recognized

certain exceptions to sovereign immunity." *Garmhausen v. Holder*, 757 F. Supp. 2d 123, 135 (E.D.N.Y. 2010).

One recognized exception is for "the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution." *Bell v. Hood*, 327 U.S. 678, 684 (1946) (citing, e.g., *Philadelphia Co. v. Stimson*, 223 U.S. 605 (1912)); *see also Zielinski v. DeFreest*, No. 12-CV-1160 (JPO), 2013 WL 4838833, at *15 (S.D.N.Y. Sept. 10, 2013) ("Individuals' right to seek injunctive and declaratory relief against state or federal officers in their official capacities for alleged constitutional violations is well established.").

The existence of a non-damages remedy to prevent future wrongs can be seen as a limit on sovereign immunity. In *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949), after explaining that sovereign immunity finds justification in the concept that interference by the courts in the ordinary duties of the executive branch "would be productive of nothing but mischief," *id.* at 704 (quotations omitted), the Supreme Court went on to state, "[t]here are limits, of course. Under our constitutional system, certain rights are protected against governmental action and, if such rights are infringed by the actions of officers of the Government, it is proper that the courts have the power to grant relief against those actions." *Id.*

So, for example, "sovereign immunity will not shield the action of an officer of the sovereign when that action is not within the officer's statutory powers or, if within those powers, only if the powers, or their exercise in the particular case, are constitutionally void." *Garmhausen*, 757 F. Supp. 2d at 135 (citation omitted). "Sovereign immunity is therefore no bar to claims for prospective relief that seek to compel governmental defendants to conform their official conduct to a legal mandate." *Id.* (citation omitted).

The Second Circuit has not provided guidance as to whether sovereign immunity bars a claim based on the Eighth Amendment for injunctive relief against federal prison officers in their official capacity.[13]

The Tenth and Eleventh Circuits have, however, found that it does not.  In *Simmat v. United States Bureau of Prisons*, 413 F.3d 1225 (10th Cir. 2005), a federal prisoner sued a group of prison dentists in their official capacity, alleging that the dentists failed to comply with their Eighth Amendment obligations.  *See id.* at 1228-30.  He sought no damages, only injunctive relief, asking "simply to be examined by the dentists and to receive whatever care they believe is necessary in their professional judgment and under the Eighth Amendment."  *Id.* at 1235.  The Tenth Circuit rejected the defendants' claim of sovereign immunity, explaining that, should they prevail on this point, it "would leave prisoners without a remedy for federal prison officials' failure to carry out their constitutional duties, violating the basic principle that 'where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.'"  *Id.* at 1233 (quoting *Bell*, 327 U.S. at 684) (alteration omitted).  After pointing out the problem with courts analyzing claims for injunctive relief under *Bivens*, the appeals court found instead that there were statutory bases for claims for injunctions through general federal question jurisdiction pursuant to 28 U.S.C. § 1331, a waiver of sovereign immunity from injunctive relief under the Administrative Procedures Act, 5 U.S.C. § 302, and mandamus actions under 28 U.S.C. § 1361.  *Id.* at 1231-1235.  The Tenth Circuit concluded that "[s]overeign

---

[13] It has found that injunctions against state prison officials pursuant to the Eighth Amendment were proper. *See Jolly v. Coughlin*, 76 F.3d 468, 471 (2d Cir. 1996) (affirming the district court's grant of a preliminary injunction against a prison because the inmate demonstrated a substantial likelihood of success on the merits of his claim that the prison violated his Eighth Amendment rights); *Mitchell v. Cuomo*, 748 F.2d 804, 808 (2d Cir. 1984) (affirming the district court's grant of the inmate-plaintiffs' application for a preliminary injunction prohibiting the state from closing a prison because doing so would likely result in irreparable harm to the prisoners' Eighth Amendment rights).

immunity is therefore not a bar to [the prisoner's] action for injunctive relief against the prison dentists." *Id.* at 1233 (footnote omitted), 1236.

Similarly, in *Doe v. Wooten*, 376 F. App'x 883 (11th Cir. 2010), the Eleventh Circuit vacated a grant of summary judgment in which the district court concluded, *inter alia*, that the individual defendants sued in their official capacities for injunctive relief were entitled to sovereign immunity. *See id.* at 884. The appeals court held that "a plaintiff may be able to obtain injunctive relief against a federal officer acting in his official capacity when the officer acts beyond statutory or constitutional limitations," and "the Eighth Amendment violations [p]laintiff alleges are within the types of actions by prison officials that may, if proved, warrant injunctive relief." *Id.*

District courts in other circuits have also found that sovereign immunity does not prevent prisoners from seeking injunctive relief against federal officials to enforce their Eighth Amendment rights. *See, e.g., Lovett v. Ruda*, No. 17-CV-02010 (PAB)(KLM), 2018 WL 3956596, at *3 (D. Colo. Aug. 17, 2018), *R&R adopted in part and denied in part on other grounds*, 2018 WL 4659111 (D. Colo. Sept. 28, 2018), *appeal dismissed by*, 2018 WL 8058575 (10th Cir. Dec. 11, 2018) ("Legal authority from the Tenth Circuit Court of Appeals makes clear that . . . claims for equitable relief arising under [the Eighth Amendment] are not barred by the doctrine of sovereign immunity." (citing *Simmat*, 413 F.3d at 123)); *Woody v. U.S. Bureau of Prisons*, No. 16-CV-862 (DWF)(BRT), 2016 WL 7757523, at *1-4 (D. Minn. Nov. 22, 2016), *R&R adopted*, 2017 WL 150505 (D. Minn. Jan. 13, 2017) (rejecting defendants' argument that plaintiff's request for an injunction based on the Eighth Amendment should be dismissed on sovereign immunity grounds); *Maxton v. United States*, No. 12-CV-00383 (WYD) (KMT), 2013 WL 6068514, at *5 (D. Colo. Nov. 18, 2013) ("The United States' Motion should be denied insofar as it seeks dismissal [on sovereign immunity grounds] of the claims against the United States and the BOP Director in his official capacity for injunctive relief."); *Singletary v. Fallen*, No. 11-CV-543 (CMC)(PJG), 2012 WL 368375, at *4 (D.S.C. Jan. 17, 2012), *R&R adopted*,

2012 WL 368364 (D.S.C. Feb. 3, 2012) ("Thus, because [the plaintiff] appears to seek only injunctive relief against the defendants in their official capacities, and because his Eighth Amendment claim raises a federal question, the court finds that it has jurisdiction over [the plaintiff's] suit for injunctive relief." (citing *Simmat*, 413 F.3d 1225)); *Taylor v. Rice*, No. 10-CV-4746 (SRN)(JJG), 2012 WL 246014, at *3-5 (D. Minn. Jan. 6, 2012), *R&R adopted*, 2012 WL 246038, at *5-7 (D. Minn. Jan. 25, 2012) (rejecting the prison-official defendants' argument that sovereign immunity bars the plaintiff's request for an injunction to safeguard his Eighth Amendment rights); *Foreman v. Unnamed Officers of the Fed. Bureau of Prisons*, No. 09-CV-2038 (DKC), 2010 WL 4781333, at *3 (D. Md. Nov. 17, 2010) ("Plaintiff in this case has a right to pursue injunctive and declaratory relief to rectify the purported [Eighth Amendment] wrongs."); *Sabina v. Fed. Bureau of Prisons*, No. 08-CV-3903 (TLW)(PJG), 2010 WL 972579, at *3 (D.S.C. Feb. 12, 2010), *R&R adopted*, 2010 WL 960412 (D.S.C. Mar. 11, 2010) ("The pertinent question here is whether sovereign immunity protects federal officials from a suit naming them in their official capacities when injunctive relief rather than damages is sought.  The answer is no." (citation omitted)); *Everett v. Francis*, No. 5:07-CV-135, 2009 WL 2971359, at *5 (N.D. W. Va. Sept. 16, 2009) ("In this case, the plaintiff has asked for specific injunctive relief; that he be transferred to another facility that can adequately care for his medical needs.  Therefore, based upon a *de novo* review, this Court finds that, under *Ex Parte Young*, the plaintiff's action in this case is not barred by sovereign immunity to the extent that the plaintiff is suing defendants . . . in their official capacity and is seeking a prospective equitable remedy.").

The Official Defendants argue that the claim for injunctive relief should be dismissed because Plaintiffs fail to plead an express waiver of sovereign immunity and there is otherwise no basis for such a claim.  However, the cases on which the Official Defendants rely do not support that conclusion.  Most of these cases discuss sovereign immunity only in the context of *Bivens* suits, not requests for injunctions.  *See Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir.

1994) (holding that the plaintiff's *Bivens* action was "dismissed for want of subject matter jurisdiction" because "such suits are [ ] barred under the doctrine of sovereign immunity" (citation and footnote omitted)); *Gay v. Terrell*, No. 12-CV-02925 (CBA)(VMS), 2013 WL 5437045, at *27 (E.D.N.Y. Sept. 27, 2013) (reading *pro se* plaintiff's complaint to assert claims against MDC Brooklyn and individual defendants in their official capacities, pursuant to *Bivens*, and finding that "[b]ecause sovereign immunity protects the United States, its officers and its agencies from such suits and there is no waiver of sovereign immunity here, subject matter jurisdiction is lacking over Plaintiff's claims" (citation omitted)); *Chao v. Holder*, No. 10-CV-2432 (RRM)(LB), 2011 WL 6837761, at *4 (E.D.N.Y. Dec. 29, 2011) ("The United States has not waived sovereign immunity for constitutional tort claims against itself, its agencies, or federal employees sued in their individual capacities."); *Williams v. United States*, No. 07-CV-3018 (RJS)(THK), 2010 WL 963474, at *9 (S.D.N.Y. Feb. 25, 2010), *R&R adopted*, 2010 WL 963465 (S.D.N.Y. Mar. 16, 2010) ("Here, as Plaintiff alleges that Defendants used excessive force and harassed him, in violation of the First, Fifth, Sixth, and Eighth Amendments of the United States Constitution, he is asserting constitutional torts, and there is no waiver of sovereign immunity.").

Other cases the Official Defendants cite examine whether particular provisions not at issue here waive sovereign immunity. In *United States v. Mitchell*, 463 U.S. 206 (1983), the Supreme Court held that the Tucker Act waived sovereign immunity for a set of actions before the Court of Claims. *Id.* at 228. Similarly, in *Adeleke v. United States*, 355 F.3d 144 (2d Cir. 2004), the Second Circuit held that Federal Rule of Criminal Procedure 41(g) does not waive sovereign immunity in suits "order[ing] the United States to pay money damages." *Id.* at 151.

While some of these cases included requests for injunctive relief along with claims for damages, the distinction between those two types of actions was not discussed by the court in those decisions. For example, in *Gay*, the plaintiff alleged that he received inadequate medical care in

violation of the Eighth Amendment and sought both money damages and medical treatment.  *See Gay*, 2013 WL 5437045, at *6 ("As relief, [p]laintiff requests proper medical treatment and $1,000,000.00.").  However, the discussion in *Gay* was framed exclusively as regarding a *Bivens* action (which is limited to money damages), and the court concluded that sovereign immunity barred a suit against the United States, its agencies, and individual officials in their official capacities.  *Id.* at *27-28.

Finally, the Official Defendants argue that "Plaintiffs cannot assert jurisdiction over the Official Defendants based on the Eighth Amendment because the Eighth Amendment itself does not constitute a waiver of sovereign immunity." (Motion at 6 (citing *McKnight v. Civiletti*, 553 F. Supp. 904, 905-06 (E.D. Pa. 1982).)  The Official Defendants' reliance on *McKnight* is misplaced.  First, the court there did not consider whether the Eighth Amendment constituted a waiver of sovereign immunity.  The plaintiff in *McKnight* brought suit alleging he was deprived of his constitutional rights to liberty and property without due process of law and denied equal protection of the laws based on allegations that government officials failed to honor a plea agreement, that he was selectively prosecuted, and that property seized from him had not been returned.  *McKnight*, 553 F. Supp. at 905.  To the extent that the Eighth Amendment was implicated at all, the court dismissed such a claim in a footnote, explaining that even "under the most liberal reading of McKnight's complaint, he has not stated a claim against these defendants for violation of his rights under the eighth amendment."  *Id.* at 905 n.1.  Furthermore, after dismissing the claim for damages, the court dismissed the plaintiff's claims for declaratory and injunctive relief, finding it "obvious" that the suit was in reality not an attempt to vindicate his civil rights, but rather to secure his release from incarceration, and should more properly have been brought as a petition for *habeas corpus. See id.* at 907.  Thus, despite its broad statement that "in a suit against the United States, under the common law doctrine of sovereign immunity, 'unless sovereign immunity has been waived, it bars equitable as

well as legal remedies against the United States,'" *id.* at 906 (quoting *Jaffee v. United States*, 592 F.2d 712, 717 n.10 (3d Cir. 1979)),[14] the court in *McKnight* relied on numerous other grounds for rejecting the claim for injunctive relief.

Plaintiffs plead as the basis for this Court's jurisdiction 28 U.S.C. §§ 1331 and 1361 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. (Am. Compl. ¶ 7.) Because sovereign immunity does not appear to bar a claim for injunctive relief against the types of violations alleged by the Plaintiffs, the undersigned concludes that the Official Defendants have not met their burden under Federal Rule of Civil Procedure 12(b)(1). Accordingly, the undersigned respectfully recommends that the Motion be denied as to the claim for injunctive relief in Count II.[15]

---

[14] *Jaffee* was itself a case in which the court expressed skepticism about the true nature of the request for injunctive relief, stating that the plaintiff attempted to "transform [his] claim for damages into an equitable action that orders the payment of money." *Jaffee*, 592 F.2d at 715 (plaintiff's "complaint seeks an injunction ordering either the provision of medical services by the Government or payment for the medical services. The payment of money would fully satisfy [the plaintiff's] 'equitable' claim for medical care.").

[15] Defendants also assert in a footnote that "the injunctive relief claims of all of the Plaintiffs, also either are moot and/or lack standing against the Official Defendants." (Motion at 6 n.2.) Defendants provide no analysis to support this argument. Such arguments, "advanced in a single footnote," need not be considered. *Tummino v. Hamburg*, 936 F. Supp. 2d 162, 193 (E.D.N.Y. 2013). In any event, the putative class action claim for injunctive relief is not moot as it is "capable of repetition, yet evading review." *Amador v. Andrews*, 655 F.3d 89, 93 (2d Cir. 2011) (holding that "the claims for injunctive and declaratory relief by appellants who are now free but were in [ ] custody when they brought suit are not moot").

## CONCLUSION

Based on the foregoing, the undersigned respectfully recommends that the Motion be granted as to Count I of the Amended Complaint, and that Count I be dismissed; and that the Motion be denied as to Count II.

Any written objections to this Report and Recommendation must be filed within 14 days of service of this report. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to file objections within the specified time waives the right to appeal any order or judgment entered based on this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

**SO ORDERED:**

*Peggy Kuo*

PEGGY KUO
United States Magistrate Judge

Dated:    Brooklyn, New York
          May 17, 2020